## Texaco Refining and Marketing Company, Inc. *v.* Commissioner of Revenue Services
### (12966)

Peters, C. J., Healey, Shea, Dupont and McKeever, Js.

Argued February 5—decision released March 24, 1987

*John W. Cannavino,* with whom were *William H. Narwold, Herbert W. Powell,* pro hac vice, and, on the brief, *Medina S. Vasily,* for the appellant (plaintiff).

*Edward T. Blair,* assistant attorney general, with whom were *Richard K. Greenberg,* assistant attorney general, and, on the brief, *Joseph I. Lieberman,* attorney general, for the appellee (defendant).

Peters, C. J. The sole issue in this case, which comes to us by way of reservation, is whether moneys col-

lected as a tax from customers are includable in the Connecticut gross earnings tax on the sale of petroleum products.[1] The plaintiff, Getty Refining and Marketing Company, Inc.,[2] appealed to the Superior Court from a decision of the defendant commissioner holding that the plaintiff had underpaid the gross earnings tax imposed by General Statutes § 12-587[3] for the years

[1] The Connecticut gross earnings tax on the sale of petroleum products is codified in General Statutes §§ 12-587 through 12-602.

[2] After the filing of the appeal in the Superior Court, Texaco, Inc., acquired Getty Refining and Marketing Company, Inc. The name of the plaintiff company was thereafter changed to Texaco Refining and Marketing Company, Inc.

[3] "[General Statutes (Rev. to 1985)] Sec. 12-587. QUARTERLY TAX ON GROSS EARNINGS FROM SALE OF PETROLEUM PRODUCTS. Any company, including for purposes of this section and section 12-587a, any corporation, partnership, limited partnership, association or individual, which is engaged in the refining or distribution, or both, of petroleum products and distributes such products in this state shall pay a quarterly tax at the rate of two per cent of gross earnings in each taxable quarter derived by such company from the sale of petroleum products in this state, provided such tax shall only be applicable to that sale of any such product which is the first sale of such product in the state. No deduction shall be made from such gross earnings for any commission, rebate or other payment, except a refund resulting from an error or overcharge. Each such company shall, on or before the last day of January, April, July and October of each year, render to the commissioner of revenue services under oath of its treasurer or the person performing the duties of treasurer or of an authorized agent or officer, a return on forms prescribed or furnished by said commissioner, including in respect to such company the amount of gross earnings from the sale of petroleum products within this state for the quarter ending with the last day of the preceding month. The tax imposed under sections 12-587 to 12-602, inclusive, shall be in addition to any other tax imposed by Connecticut with respect to which such company is liable. For purposes of sections 12-587 to 12-602, inclusive, 'petroleum products' includes any product which contains or is made from petroleum or a petroleum derivative; 'gross earnings' are (1) in the case of a corporation, those earnings from the sale of petroleum products to which the sales factor is applied under subdivision (3) [now (b)] of section 12-218 and (2) in the case of any other company, those earnings from such sales made within this state."

The definition of "gross earnings" in § 12-587 was amended in 1985. See Public Acts 1985, No. 85-381. This amendment was not in effect during any of the tax years in question, however. Accordingly, we restrict our analysis to the version of § 12-587 in effect prior to the 1985 amendment.

1980 through 1984. The trial court granted a motion for reservation upon stipulated facts to determine the propriety of the defendant's computation of the plaintiff's gross earnings tax. We conclude that the reserved question[4] is to be answered in the affirmative.

The parties stipulated to the following facts. The plaintiff is a Delaware corporation authorized to do business in this state. On its invoices to Connecticut purchasers of its petroleum products, the plaintiff charged these purchasers separately for the sales price and for the 2 percent Connecticut gross earnings tax that it collected from them pursuant to General Statutes § 12-587.[5] In filing its quarterly gross earnings tax returns between December 31, 1980, and March 31, 1984, the plaintiff did not report as gross earnings the 2 percent which, in its invoices, it had labeled as a separate charge for the gross earnings tax.

Disagreeing with the plaintiff's exclusion of the 2 percent in its calculation of the gross earnings tax, the department of revenue services notified the plaintiff that it owed an additional gross earnings tax on the excluded 2 percent charge for the relevant tax years.[6] The plaintiff sought administrative relief from this rul-

[4] The question of law that has been reserved for our advice is: "Was the two percent charge, which was noted on Getty invoices as a charge for the Connecticut Gross Earnings Tax, includable in Getty's gross earnings derived from the sale of petroleum products and subject to a two percent tax under Section 12-587?"

[5] Under General Statutes § 12-587, this tax was imposed upon the plaintiff, but after the decision in *Mobil Oil Corporation* v. *Dubno*, 492 F. Sup. 1004 (D. Conn. 1980), aff'd in part and dismissed in part, 639 F.2d 919 (2d Cir.), cert. denied, 452 U.S. 967, 101 S. Ct. 3122, 69 L. Ed. 2d 980 (1981), the plaintiff was able to pass through the tax to its purchasers.

[6] The disagreement between the parties can best be illustrated by a hypothetical example. Assume that the plaintiff sold petroleum products to a customer for a sales price of $1000—and a 2 percent tax of $20. According to the plaintiff, its taxable gross earnings on this transaction are $1000. According to the defendant, the plaintiff's taxable gross earnings are $1020.

ing pursuant to General Statutes § 12-595[7] but the defendant, after a hearing, upheld the department's conclusion that the plaintiff was liable for the additional tax, interest and penalties. The plaintiff paid this amount in full, under protest, as it was required to do by General Statutes § 12-600,[8] before commencing its appeal to the trial court pursuant to General Statutes § 12-597.[9]

[7] "[General Statutes] Sec. 12-595. APPLICATION FOR HEARING BY TAXPAYER. HEARINGS ORDERED BY COMMISSIONER. Any taxpayer aggrieved by the action of the commissioner of revenue services or an authorized agent of said commissioner in fixing the amount of tax imposed under section 12-587 or any penalty or interest related thereto may apply to said commissioner in writing, within thirty days after notice of such action is delivered or mailed to such taxpayer, for a hearing and a correction of the amount of such tax, penalty or interest should be reduced. Said commissioner shall promptly consider each such application and may grant or deny the hearing requested. If the hearing is denied, the applicant shall be notified thereof forthwith. If it is granted said commissioner shall notify the applicant of the time and place fixed for such hearing. After such hearing said commissioner may make such order in the premises as appears to him just and lawful and shall furnish a copy of such order to the applicant. Said commissioner may, by notice in writing, at any time within three years after the date when any return of any taxpayer has been due, order a hearing on his own initiative and require the taxpayer or any other individual whom he believes to be in possession of relevant information concerning the taxpayer to appear before him or his authorized agent with any specified books of account, papers or other documents, for examination under oath."

[8] "[General Statutes] Sec. 12-600. TAXES TO BE PAID BEFORE INSTITUTING ACTION ON TAX IN COURT. Any taxes, penalties or interest due from any company under the provisions of sections 12-587 to 12-602, inclusive, shall be paid in full before any action may be instituted in any state court to challenge all or any part of the provisions of said sections. No injunction or restraining order shall be issued by any state court to stay or prevent the imposition or collection of taxes as provided under said sections."

[9] "[General Statutes] Sec. 12-597. APPEALS BY TAXPAYER. Any taxpayer aggrieved because of any order, decision, determination or disallowance of the commissioner of revenue services made in relation to the tax imposed under section 12-587 may, within one month after service upon the taxpayer of notice of such order, decision, determination or disallowance, take an appeal therefrom to the superior court for the judicial district of Hartford-New Britain, which shall be accompanied by a citation to said commissioner to appear before said court. Such citation shall be signed by the same authority and such appeal shall be returnable at the same time and served and

In the trial court, the parties jointly requested that the case be reserved for appellate advice on the stated question of law whether the gross earnings upon which § 12-587 levies a tax includes the 2 percent charge collected by the plaintiff taxpayer from its customers. The trial court granted this request, and, after transfer of the appeal to this court, the present proceedings ensued.

Before we reach the merits of the reserved question, three preliminary matters warrant brief clarification. First, because the statute authorizing reservations, General Statutes § 52-235,[10] does not require that a case be at the final judgment stage when the reservation is brought, this court has jurisdiction to decide the reserved question even though the case is here on an interlocutory appeal. Practice Book § 4147 (formerly § 3133)[11]; *State* v. *Sanabria,* 192 Conn. 671, 681–85, 474 A.2d 760 (1984); *New Haven Metal & Heating Sup-*

returned in the same manner as is required in case of a summons in a civil action. The authority issuing the citation shall take from the appellant a bond or recognizance to the state of Connecticut with surety to prosecute the appeal to effect and to comply with the orders and decrees of the court in the premises. Such appeals shall be preferred cases, to be heard, unless cause appears to the contrary, at the first session, by the court or by a committee appointed by it. If the appeal has been taken without probable cause, the court may tax double or triple costs, as the case demands and upon all such appeals which may be denied, costs may be taxed against the appellant at the discretion of the court, but no costs shall be taxed against the state."

[10] "[General Statutes] Sec. 52-235. RESERVATION OF QUESTIONS OF LAW. (a) The superior court, or any judge of the court, with the consent of all parties of record, may reserve questions of law for the advice of the supreme court or appellate court in all cases in which an appeal could lawfully have been taken to said court had judgment been rendered therein.

"(b) The court or judge making the reservation shall, in the judgment, decree or decision made or rendered in such cases, conform to the advice of the supreme court or the appellate court."

[11] Practice Book § 4147 (formerly § 3133) provides: "A reservation shall be taken to the supreme court or to the appellate court from those cases in which an appeal could have been taken directly to the supreme court, or to the appellate court, respectively, had judgment been rendered. Reser-

*ply Co.* v. *Danaher,* 128 Conn. 213, 218, 21 A.2d 383 (1941). Second, because this case is an appeal from an adverse ruling of the commissioner of revenue services, the plaintiff is entitled to a plenary review of its challenge of its tax assessment, and is not limited to an administrative appeal under the Uniform Administrative Procedure Act. General Statutes § 4-186[12]; Practice Book § 257 (d) (3)[13]; see *Schlumberger Technology Corporation* v. *Dubno,* 202 Conn. 412, 421, 521 A.2d 569 (1987); *Xerox Corporation* v. *Board of Tax Review,* 175 Conn. 301, 303, 397 A.2d 1367 (1978). Third, because the question posed by the reservation principally concerns the imposition of a tax, and not a claimed right to an exemption or a deduction, the taxing statute must be strictly construed against the taxing authority and in favor of the taxpayer. *Schlumberger*

vations in cases where the proper court for the appeal cannot be determined prior to judgment shall also be taken directly to the supreme court.

"All questions presented for advice shall be specific and shall be phrased so as to require a Yes or No answer.

"The court will not entertain a reservation for its advice upon questions of law arising in any action unless the question or questions presented are such as are, in the opinion of the court, reasonably certain to enter into the decision of the case, and it appears that their present determination would be in the interest of simplicity, directness and economy of judicial action.

"The advice of the appellate court on a reservation may be reviewed by the supreme court only upon the granting of certification as provided by chapter 72."

[12] "[General Statutes] Sec. 4-186. EXEMPTION OF UNEMPLOYMENT COMPENSATION AND EMPLOYMENT SECURITY APPEALS. Appeals from the decisions of the administrator of the unemployment compensation act, appeals from decisions of the employment security appeals referees to the board of review, and appeals from decisions of the employment security board of review to the courts, as is provided in chapter 567, and appeals from the commissioner of revenue services to the courts, as provided in chapters 207 to 212a, inclusive, 214, 215, 219, 221, 222, 224 and 225 are excepted from the provisions of this chapter."

[13] "[Practice Book] Sec. 257. TRIAL LIST FOR ADMINISTRATIVE APPEALS; BRIEFS; PLACING CASES THEREON. . . . (d) The following administrative appeals shall, subsequent to the filing of the appeal, follow the same course of pleading as that followed in ordinary civil actions . . . (3) Appeals from the commissioner of revenue services."

*Technology Corporation* v. *Dubno,* supra, 420–23; *The B.F. Goodrich Co.* v. *Dubno,* 196 Conn. 1, 6, 8–9, 490 A.2d 991 (1985).

The crucial question raised by the reservation is what meaning to attach to that portion of § 12-587 which imposes a 2 percent tax on "the amount of gross earnings from the sale of petroleum products within this state." We approach this question according to well established principles of statutory construction designed to further our fundamental objective of ascertaining and giving effect to the apparent intent of the legislature. *State* v. *Kozlowski,* 199 Conn. 667, 673, 509 A.2d 20 (1986); *Hayes* v. *Smith,* 194 Conn. 52, 57, 480 A.2d 425 (1984). In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. *Dart & Bogue Co.* v. *Slosberg,* 202 Conn. 566, 572, 522 A.2d 763 (1987); *State* v. *Blasko,* 202 Conn. 541, 553, 522 A.2d 753 (1987); *Rhodes* v. *Hartford,* 201 Conn. 89, 93, 513 A.2d 124 (1986).

Starting, as we must, with the language of the statute itself, we note that § 12-587 defines "gross earnings" in two alternative ways: "(1) in the case of a corporation, those earnings from the sale of petroleum products to which the sales factor is applied under subdivision (3) [now (b)] of section 12-218 and (2) in the case of any other company, those earnings from such sales made within this state." Both parties have addressed their attention only to subsection (1). The sales factor of General Statutes § 12-218,[14] to which

---

[14] General Statutes § 12-218 provides: "APPORTIONMENT OF NET INCOME. Any taxpayer which is taxable both within and without this state shall apportion its net income as provided in this section. For purposes of apportionment

§ 12-587 (1) refers, is one component of a three factor formula designed to apportion to Connecticut, for the purposes of the corporation business tax, a portion of the taxable income of multistate corporations whose income is derived, inter alia, from the sale of personal

of income under this section, a taxpayer is taxable in another state if in such state such taxpayer conducts business and is subject to a net income tax, a franchise tax for the privilege of doing business, or a corporate stock tax, or if such state has jurisdiction to subject such taxpayer to such a tax, regardless of whether such state does, in fact, impose such a tax. The net income of the taxpayer shall be apportioned as follows: (a) Such income, when derived from business other than the manufacture, sale or use of tangible personal or real property, shall be apportioned within and without the state by means of an apportionment fraction, the numerator of which shall represent the gross receipts from business carried on within Connecticut and the denominator shall represent the gross receipts from business carried on everywhere, except that any gross receipts attributable to an international banking facility, as defined in section 12-217, shall not be included in the numerator or the denominator; (b) when derived from the manufacture, sale or use of tangible personal or real property, the portion thereof attributable to business within the state shall be determined by means of an apportionment fraction to be computed as the sum of the property factor, the payroll factor and twice the receipts factor, divided by four. The first of these fractions, the property factor, shall represent that part of the average monthly net book value of the total tangible property held and owned by the taxpayer during the income year which is held within the state, without deduction on account of any encumbrance thereon, and the value of tangible property rented to the taxpayer computed by multiplying the gross rents payable during the income year or period by eight. For the purpose of this section, gross rents shall be the actual sum of money or other consideration payable, directly or indirectly, by the taxpayer or for its benefit for the use or possession of the property, excluding royalties, but including interest, taxes, insurance, repairs or any other amount required to be paid by the terms of a lease or other arrangement and a proportionate part of the cost of any improvement to the real property made by or on behalf of the taxpayer which reverts to the owner or lessor upon termination of a lease or other arrangement, based on the unexpired term of the lease commencing with the date the improvement is completed, provided, where a building is erected on leased land by or on behalf of the taxpayer, the value of the land is determined by multiplying the gross rent by eight, and the value of the building is determined in the same manner as if owned by the taxpayer. The second fraction, the payroll factor, shall represent the part of the total wages, salaries and other compensation to employees paid by the taxpayer during the income year which was paid

property. *Schlumberger Technology Corporation* v. *Dubno,* supra, 416. This factor is defined, in § 12-218, as "the part of the taxpayer's gross receipts from sales or other sources during the income year . . . which is assignable to the state." The difficulty created by the cross-reference to § 12-218 is the statutory disparity

in this state, excluding any such wages, salaries or other compensation attributable to the production of gross income of an international banking facility as defined in section 12-217. Compensation is paid in this state if (i) the individual's service is performed entirely within the state; or (ii) the individual's service is performed both within and without the state, but the service performed without the state is incidental to the individual's service within the state; or (iii) some of the service is performed in the state and (1) the base of operations or, if there is no base of operations, the place from which the service is directed or controlled is in the state, or (2) the base of operations or the place from which the service is directed or controlled is not in any state in which some part of the service is performed, but the individual's residence is in this state. The third fraction, the receipts factor, shall represent the part of the taxpayer's gross receipts from sales or other sources during the income year, computed according to the method of accounting used in the computation of its entire net income, which is assignable to the state, and excluding any gross receipts attributable to an international banking facility as defined in section 12-217, but including receipts from sales of tangible property if the property is delivered or shipped to a purchaser within this state, other than a company which qualifies as a Domestic International Sales Corporation (DISC) as defined in Section 992 of the Internal Revenue Code of 1954, as amended, and as to which a valid election under Subsection (b) of said Section 992 to be treated as a DISC is effective, regardless of the f.o.b. point or other conditions of the sale, receipts from services performed within the state, rentals and royalties from properties situated within the state, royalties from the use of patents or copyrights within the state, interest managed or controlled within the state, net gains from the sale or other disposition of intangible assets managed or controlled within the state, net gains from the sale or other disposition of tangible assets situated within the state and all other receipts earned within the state; and (c) any motor bus company carrying on business partly without the state shall apportion to this state its net income derived from carrying of passengers for hire by means of an apportionment fraction, the numerator of which shall represent the total number of miles operated within this state and the denominator of which shall represent the total number of miles operated everywhere, but income derived by motor bus companies from sources other than the carrying of passengers for hire shall be apportioned as herein otherwise provided. The provisions of this section shall not apply to insurance companies."

between the coverage of the petroleum products tax and the corporation business tax. While § 12-587 purports to tax "gross earnings," the income that § 12-218 apportions to this state is a taxpayer's "net income."

In the face of this statutory conundrum, the parties have, not surprisingly, proffered alternate constructions of "gross earnings" in § 12-587. Their disagreement revolves around four issues. First, does the statutory definition of "gross earnings" in § 12-587 have a plain and unambiguous meaning that we must enforce? Second, if the statute requires construction beyond its plain meaning, what inferences should be drawn from its legislative history and the purpose it was intended to serve? Third, what insights do related statutes offer about the legislature's intention in its choice of language in this section? Fourth, to what extent does the statute authorize administrative elaboration of those provisions that cannot readily be applied literally?

The plaintiff's principal argument is that its tax liability is governed by the express language of § 12-587 (1) which, it maintains, plainly and unambiguously precludes the inclusion in gross income of the 2 percent tax imposed upon it but collected from its customers. The plaintiff reads the definition of "gross earnings" in § 12-587 (1) as containing two component parts, neither of which renders this 2 percent charge taxable. Specifically, the plaintiff argues, moneys collected from consumers for taxes are plainly neither "earnings from the sale of petroleum products" nor do they fall within the "net income" to which the § 12-218 sales factor applies. We disagree.

The first half of the plaintiff's statutory argument, on which it relies in passing, cannot withstand independent analysis. What the legislature intended by defining "gross earnings" as "earnings from the sale

of petroleum products" can hardly be deemed to be plain and unambiguous on its face. The heart of the disagreement between the parties is how to define the relevant "earnings."

The weightier part of the plaintiff's statutory argument is its insistence that we must read literally and apply strictly the statutory instruction that "gross earnings" are "those earnings . . . to which the sales factor *is applied*" under § 12-218 (b). (Emphasis added.) Because the sales factor is applied, by that statute, to net income, the plaintiff maintains that "gross earnings" under § 12-587 are limited to net income. Pursuing that syllogism, the plaintiff argues that its "gross earnings" do not include tax payments that are normally deductible in the calculation of net income.[15] The difficulty with this argument is that it proves too much. If "gross earnings" are indeed to be measured by "net income," expenses other than taxes would also be deductible from gross receipts in order to determine the basis upon which the § 12-587 tax is to be levied. To its credit, not even the plaintiff has pursued the logic of its position to this extreme. Nonetheless, the logical consequence of the plaintiff's position demonstrates that the legislature could not have intended the irrational result that would follow from an equation of "gross earnings" with net income. We must reject an interpretation of § 12-587 that would have the statute operate in a way that is "difficult and possibly bizarre." *State* v. *Blasko,* supra, 558–59; *Maciejewski* v. *West Hartford,* 194 Conn. 139, 152, 480 A.2d 519 (1984).[16]

---

[15] Under General Statutes § 12-213, "net income" is computed by subtracting from gross income "the deductions allowed by the terms of section 12-217." Allowable deductions under General Statutes § 12-217 include most of the items deductible under the federal corporate income tax in force during the relevant income year.

[16] We note that the plaintiff's construction of subsection (1) of General Statutes § 12-587 would leave untouched the general reference to "earnings" of companies taxed pursuant to subsection (2). It is not likely that the legislature would have defined gross earnings as the equivalent of net income for only one part of § 12-587.

It is possible to ascribe meaningful content to the cross-reference in § 12-587 to the sales factor in § 12-218 (b) if we read that cross-reference to incorporate only the sales factor itself and not its net income attributes. Such a construction is plausible because § 12-218 is not a taxing statute but is, instead, an allocation statute. All that § 12-218 purports to do is to assign to Connecticut that portion of a multistate corporation's income that may thereafter, under § 12-214, be taxed in Connecticut pursuant to the corporation business tax. *Schlumberger Technology Corporation* v. *Dubno,* supra. Presumably, the legislature included a reference to § 12-218 (b) in the "gross earnings" definition of § 12-587 in order to reflect its understanding of the prevailing multistate system for the refining and distribution of petroleum products. See *Mobil Oil Corporation* v. *Dubno,* 492 F. Sup. 1004, 1006 (D. Conn. 1980), aff'd in part and dismissed in part, 639 F.2d 919 (2d Cir.), cert. denied, 452 U.S. 967, 101 S. Ct. 3122, 69 L. Ed. 2d 980 (1981). What is most significant in § 12-218 (b), therefore, for purposes of the petroleum gross earnings tax, is its description of the components of the sales factor, i.e., "gross receipts," and not that this factor is applied, for apportionment purposes, to net income. Informed by § 12-218, therefore, the statutory definition of "gross earnings" in § 12-587 instructs us to look to the usual meaning of "gross receipts." Such a definition, because it is not plain and unambiguous, requires recourse to more than linguistic analysis.

In order to shed further light on the scope of "gross earnings" in § 12-587, we turn next to an examination of the purpose that the gross earnings tax on petroleum products was intended to serve. The legislature expressly described that purpose in General Statutes § 12-599 (a), which states: "It is not the intention of the general assembly that the tax imposed under section 12-587 be construed as a tax upon purchasers of

petroleum products, but that such tax shall be levied upon and be collectible from petroleum companies as defined in section 12-587, and that such tax shall constitute a part of the operating overhead of such companies." Subsection (b) of § 12-599[17] enjoined petroleum companies subject to the tax from raising their wholesale prices in Connecticut by any amount higher than the average amount of wholesale price increases "in all ports on the eastern coast of the United States." Upon a challenge to the constitutionality of the anti-passthrough provision of § 12-599 (b), that subsection was held invalid because it conflicted with the federal Emergency Petroleum Allocation Act of 1973 and with federal mandatory petroleum price regulations. *Mobil Oil Corporation* v. *Dubno,* supra, 1011–14. The plaintiff maintains that this history demonstrates that the legislature, intent upon avoiding a pass through of the tax, did not contemplate a tax levy that included in its base the amount of the tax that, after the federal decision, became payable by petroleum customers. The defendant argues, to the contrary, that the unenforceability of § 12-599 (b), for constitutional reasons, does not disturb the legislative intent, manifested in § 12-599 (a), that the petroleum products tax be treated as an item of operating overhead measured, under § 12-587, by gross earnings derived from the sales of petroleum products in Connecticut. We agree with the defendant.

In enacting the gross earnings tax on petroleum products, the legislature was entitled to pursue more

---

[17] "[General Statutes] Sec. 12-599. TAX TO CONSTITUTE OPERATING OVERHEAD OF TAXPAYER. LIMITATION ON PRICE INCREASES IN THIS STATE. . . . (b) No petroleum company subject to the tax imposed under section 12-587 shall raise its posted wholesale rack price in Connecticut for any petroleum product exempt from the Federal Emergency Petroleum Allocation Act (P.L. 93-159) by an amount higher than the average amount by which such company raises its wholesale rack price for such product in all ports on the eastern coast of the United States."

than one statutory objective. In addition to its intent to limit price increases to Connecticut customers of petroleum products, the legislature was free to impose a gross earnings tax as part of the operating overhead costs of Connecticut producers and distributors of petroleum products. Neither in this case nor in the federal litigation concerning § 12-599 (b) has a constitutional challenge been raised to this latter aspect of what the legislature chose to do. *Mobil Oil Corporation* v. *Dubno,* supra, 1006. Perhaps in anticipation of the constitutional vulnerability of its anti-passthrough provision, the legislature expressly provided for the severability of any part of the petroleum products tax that might be held invalid or unconstitutional, so that the remaining "sections, parts, clauses and phrases" in §§ 12-587 to 12-602, inclusive, "shall remain in full force and effect." General Statutes § 12-601.[18] Although the legislature's first preference, to have the petroleum distributors bear the entire cost of the gross earnings tax, cannot be implemented constitutionally, we are obligated to enforce its secondary preference that the petroleum products tax be treated as an item of operating overhead measured by gross earnings derived from the sale of petroleum products in Connecticut.

In order to give effect to the legislative purpose stated in § 12-599 (a), we must construe "gross earnings" in § 12-587 in such a way that the tax "constitute[s] a part of the operating overhead" of companies that produce and distribute petroleum products. In furtherance of our task we may usefully consider existing legislation in related areas of the law; *Dart & Bogue Co.* v. *Slosberg,* supra; *State* v. *West,* 192 Conn. 488,

---

[18] "[General Statutes] Sec. 12-601. SEVERABILITY. If any section, part, clause or phrase in sections 12-587 to 12-602, inclusive, is for any reason held to be invalid or unconstitutional, sections, parts, clauses and phrases in said sections not held to be invalid or unconstitutional shall not be affected and shall remain in full force and effect."

494, 472 A.2d 775 (1984); and the judicial construction that such legislation has previously received. *C. White & Son, Inc.* v. *Rocky Hill,* 181 Conn. 114, 123, 434 A.2d 949 (1980). In a number of cases interpreting "gross earnings" under the utilities companies tax; General Statutes § 12-264[19]; we have held that "gross earnings" include a taxpayer's "entire earnings and receipts." *Bridgeport Hydraulic Co.* v. *Sullivan,* 152 Conn. 671, 673, 211 A.2d 697 (1965); *Hartford Electric Light Co.* v. *McLaughlin,* 131 Conn. 1, 6, 37 A.2d 361 (1944); *State* v. *United Electric Light & Water Co.,* 90 Conn. 452, 460, 97 A. 857 (1916). That construction furnishes a particularly appropriate analogy in this case because of the cross-reference in § 12-587 to the sales factor in § 12-218, which, as previously noted, describes the relevant inquiry as one concerned with "gross receipts." In the absence of a specific statutory exemption for tax

---

[19] General Statutes § 12-264 provides in relevant part: "TAX ON GROSS EARNINGS. RETURN. Every Connecticut municipality or department or agency thereof, or Connecticut district, manufacturing, selling or distributing gas or electricity to be used for light, heat or power, in this chapter and in chapter 212a called a 'municipal utility,' and each company, including each foreign municipal electric utility as defined in section 12-59 and given authority to engage in business in this state pursuant to the provisions of section 16-246c, the principal business of which is manufacturing, selling or distributing gas or electricity or steam to be used for light, heat or power and each company operating a system of water works for selling and distributing water for domestic or power purposes, provided such company is a water company as that term is defined in section 16-1, shall pay a quarterly tax upon gross earnings from such operations in this state. Gross earnings from such operations shall include all income classified as operating revenues by the department of public utility control in the uniform systems of accounts prescribed by said department for operations within the taxable quarter and, with respect to each such company, all income classified in said uniform systems of accounts as income from merchandising, jobbing and contract work, income from nonutility operations and revenues from lease of physical property not devoted to utility operation, and receipts from the sale of residuals and other by-products obtained in connection with the production of gas, electricity or steam. No deductions shall be allowed from such gross earnings for any commission, rebate or other payment, except a refund resulting from an error or overcharge, and those specifically mentioned in section 12-265."

receipts, we conclude, on the basis of these precedents, that § 12-587 includes within "gross earnings" the amounts that the plaintiff has collected as taxes passed through to its customers. This result is not altered by the fact that, for its own accounting purposes, the plaintiff billed its customers separately for the sales price of its petroleum products and for the taxes it collected from them.

Finally, the result we reach finds support in an administrative regulation issued by the defendant. The legislature gave the defendant express authority, in General Statutes § 12-602,[20] to adopt regulations to implement the provisions of the act imposing a gross earnings tax on petroleum products. Regulations properly promulgated under § 12-602 "shall be prima facie evidence of the proper interpretation" of the act. The relevant regulation, enacted in 1983 as § 12-602-1a (c) of the Regulations of Connecticut State Agencies, states: " 'Gross earnings' mean and include gross receipts from the initial sale of petroleum products, but do not include the amount of state or federal excise taxes on gasoline or special fuel." By its express exclusion of some taxes, but not the ones here in question, from the definition of "gross earnings" in § 12-587, the defendant has provided "prima facie evidence" that the statute is to be interpreted to include within the plaintiff's tax basis the tax payments that it has collected from its customers. The regulation's equation of "gross earn-

---

[20] "[General Statutes] Sec. 12-602. REGULATIONS. The commissioner of revenue services shall adopt regulations in accordance with chapter 54 to implement the provisions of sections 12-587 to 12-602, inclusive, which shall be prima facie evidence of the proper interpretation of said sections. Said commissioner shall prescribe and furnish the form of return required under section 12-587 and require that each such return shall set forth any and all information necessary or desirable in order to determine the amount of tax payable under said section 12-587."

ings" with "gross receipts" is consistent with our own analysis of the various statutes that illuminate what the legislature intended to encompass in the statutory definitions contained in § 12-587.

Ordinarily "the construction of a statute on an issue that has not previously been subjected to judicial scrutiny is a question of law on which an administrative ruling is not entitled to special deference." *Schlumberger Technology Corporation* v. *Dubno,* supra, 423. If, however, a governmental agency's "time-tested" interpretation of a statute is reasonable, that interpretation should be acccorded great weight by the courts. *Anderson* v. *Ludgin,* 175 Conn. 545, 555–56, 400 A.2d 712 (1978); *New Haven* v. *United Illuminating Co.,* 168 Conn. 478, 493, 362 A.2d 785 (1975). The plaintiff argues, however, that the regulation impermissibly enlarges the statutory definitions contained in § 12-587, and that, so interpreted, the regulation exceeds the power of an administrative agency to prescribe rules and regulations. We conclude, however, that the regulation is entirely reasonable and consistent with the statutory mandate of § 12-587. Furthermore, we note that the principal case on which the plaintiff relies; *Connecticut Hospital Assn.* v. *Commission on Hospitals & Health Care,* 200 Conn. 133, 144, 509 A.2d 1050 (1986); lends additional credibility to the position of the defendant in this case. In the absence of any submission to the contrary, we may assume that Regulation 12-602-1a (c) was promulgated, as § 12-602 requires, in accordance with the procedures prescribed by chapter 54 of the General Statutes, the Uniform Administrative Procedure Act. General Statutes §§ 4-166 through 4-189. Those procedures include the submission of proposed regulations to the legislative regulation review com-

mittee for its approval. General Statutes § 4-170.[21] As we held in *Connecticut Hospital Assn.* v. *Commission on Hospitals & Health Care,* supra, legislative ratification of a proposed regulation supports the position that the regulation is consistent with the general statutory scheme that the regulation was designed to implement.

The question that was reserved to this court stated the issue as follows: "Was the two percent charge, which was noted on Getty invoices as a charge for the Connecticut Gross Earnings Tax, includable in Getty's gross earnings derived from the sale of petroleum products and subject to a two percent tax under Section 12-587?" For the reasons stated above, our answer to the reserved question is "Yes."

No costs will be taxed in this court to either party.

In this opinion the other justices concurred.

---

[21] General Statutes § 4-170 provides in relevant part: "LEGISLATIVE REGU-LATION REVIEW COMMITTEE. FILING REQUIREMENTS FOR REGULATIONS. FIS-CAL NOTES REQUIRED. (a) There shall be a standing legislative committee to review all regulations of the several state departments and agencies following the proposal thereof, which shall consist of eight members of the house of representatives, four from each major party, to be appointed on the first Wednesday after the first Monday in January in the odd-numbered years, by the speaker of said house, and six members of the senate, three from each major party, to be appointed on or before said dates by the president pro tempore of the senate. Said members shall serve for the balance of the term for which they were elected. Vacancies shall be filled by appointment by the authority making the appointment. The members of said committee shall elect from among their members two cochairmen, one of whom shall be a member of the senate and one of whom shall be a member of the house of representatives, and either of whom may call meetings of the committee for the performance of its duties. . . .

"(c) The committee shall review all proposed regulations and, in its discretion, may hold public hearings thereon, and may approve, disapprove or reject without prejudice, in whole or in part, any such regulation. In the event the committee fails to so approve, disapprove or reject without prejudice a proposed regulation, within sixty-five days after the date of submission as provided in subsection (b), the committee shall be deemed to have approved the proposed regulation for purposes of this section."