UNITED ILLUMINATING COMPANY *v.* JOHN G. GROPPO, COMMISSIONER OF REVENUE SERVICES
(14321)

PETERS, C. J., CALLAHAN, GLASS, BORDEN and BERDON, Js.

Argued October 2, 1991—decision released January 7, 1992

*Paul M. Scimonelli,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellant (defendant).

*Patrick J. Monahan,* with whom, on the brief, was *Phyllis M. Pari,* for the appellee (plaintiff).

GLASS, J. The dispositive issue in this tax appeal is whether the trial court properly held that certain machinery and equipment at three electricity generating plants owned and operated by the plaintiff, United Illuminating Company (taxpayer), constitute "machinery and production equipment" at an "industrial plant" within the meaning of § 12-426-26 (d) of the Regulations of Connecticut State Agencies, and thereby qualify for an exemption from the sales tax imposed on services to "industrial, commercial or income-

producing real property" pursuant to General Statutes § 12-407 (2) (i) (I).[1] After a determination by the defendant, the commissioner of revenue services (commissioner), that the taxpayer was liable for a deficiency assessment for the period from January 1, 1983, through December 31, 1985, the taxpayer appealed to the Superior Court pursuant to General Statutes § 12-422.[2] The court concluded that the taxpayer had established that the subject property was exempt from General Statutes § 12-407 (2) (i) (I) pursuant to § 12-426-26 (d) of the Regulations of Connecticut State Agencies.[3] The commissioner appealed and the taxpayer cross appealed. We transferred the appeal from the Appellate Court in accordance with Practice Book § 4023. We reverse.

The trial court found the following facts, which are undisputed. The taxpayer is a public utility company that generates electricity for distribution to consumers in south central Connecticut. The taxpayer has three plants in Bridgeport and New Haven, each of which

[1] General Statutes § 12-407 (2) (i) (I) provides in relevant part: "DEFINITIONS. Whenever used in this chapter . . . (2) 'Sale' and 'selling' mean and include . . . (i) the rendering of certain services for a consideration, exclusive of such services rendered by an employee for his employer, as follows . . . (I) services to industrial, commercial or income-producing real property, including but not limited to, such services as management, [maintenance, janitorial,] electrical, plumbing, painting and carpentry . . . ." Public Acts 1989, No. 89-251, which became effective after the tax period relevant to this appeal, deleted the bracketed words.

[2] General Statutes § 12-422 provides in relevant part: "APPEAL. Any taxpayer aggrieved because of any order, decision, determination or disallowance of the commissioner of revenue services under section 12-418, 12-421 or 12-425 may, within one month after service upon the taxpayer of notice of such order, decision, determination or disallowance, take an appeal therefrom to the superior court for the judicial district of Hartford-New Britain . . . ."

[3] The trial court found that smokestacks at the taxpayer's plants did not qualify as machinery and production equipment within the meaning of the regulation and, thus, were taxable under General Statutes § 12-407 (2) (i) (I). The taxpayer has not appealed that ruling.

consists of an integrated system of water pipes, steam ducts, boilers, pumps, heaters, baffles, condensers, turbines, generators, transformers, smokestacks and assorted parts and connections. This integrated system heats water to steam and brings the steam to super high temperatures. The resulting heat energy turns the turbines, which use mechanical energy to turn the generators, which generate electricity. The transformers change the electricity from high current to high voltage, which is then fed by transmission lines to consumers. The component parts of the system require periodic maintenance, which is performed by third party contractors. The commissioner assessed a sales tax upon the cost of these services pursuant to General Statutes § 12-407 (2) (i) (I).

In reviewing a decision of the trial court sustaining a taxpayer's appeal from a deficiency assessment, this court must determine whether the trial court's factual findings are clearly erroneous, or whether the decision is otherwise legally erroneous. See Practice Book § 4061; *Zachs* v. *Groppo,* 207 Conn. 683, 689, 542 A.2d 1145 (1988). When a party has challenged the legal conclusions of the trial court, as the commissioner has here, we must determine whether these conclusions are legally and logically correct and find support in the facts set out in the court's memorandum of decision. *Zachs* v. *Groppo,* supra; see also *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

We note at the outset the principles of statutory construction that govern the applicability of a tax exemption. "First, statutes that provide exemptions from taxation are a matter of legislative grace that must be strictly construed against the taxpayer. Second, any ambiguity in the statutory formulation of an exemption must be resolved against the taxpayer. Third, the taxpayer must bear the burden of proving the error in

an adverse assessment concerning an exemption." *Plastic Tooling Aids Laboratory, Inc.* v. *Commissioner of Revenue Services,* 213 Conn. 365, 369, 567 A.2d 1218 (1990). Applying these principles to the present case, we conclude that the trial court incorrectly held that the taxpayer had sustained its burden of proving eligibility for the exemption from § 12-407 (2) (i) (I) for services to "machinery and production equipment" at an "industrial plant" pursuant to § 12-426-26 (d) of the regulations.

The purchase by a taxpayer of services for the maintenance of industrial, commercial or income-producing real property is subject to the sales tax under § 12-407 (2) (i) (I) unless the transaction qualifies for an exemption pursuant to another section of the Sales and Use Tax Act or regulations promulgated thereunder. The commissioner contends that the various components of the taxpayer's electric generating plants that are the subject of this appeal are commercial real property and are thus subject to the tax. The taxpayer argues first that these components are personal property, but that, even if they are deemed to be fixtures, the services rendered to them qualify for an exemption under § 12-426-26 (d) of the regulations, as services to "machinery and production equipment" at an "industrial plant." We agree with the commissioner that the taxpayer does not qualify for the exemption.[4]

---

[4] Because the trial court found that the subject property qualified as machinery and production equipment at an industrial plant, the court did not determine whether it was real or personal property. The trial court stated: "If the issue was whether or not the equipment maintained were fixtures according to Connecticut law, an inquiry would have to be made whether or not each component was attached to the realty and intended to be permanently so attached. *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.,* 193 Conn. 208, 215–16 [477 A.2d 988] (1984). However, § 12-426-26 (d) of Conn. Agencies Regulations, adopted by the Department of Revenue Services obviates such an inquiry." We agree with the taxpayer, therefore, that our reversal necessitates a remand to the trial court to determine whether the component parts of the taxpayer's facilities are real or personal property.

The taxpayer claims an exemption pursuant to § 12-426-26 (d) of the regulations, which provides in pertinent part: " 'Industrial property' shall mean and include an 'industrial plant' as defined in Section 12-426-11b of the Regulations of Connecticut State Agencies and all real estate with structures thereon, if any, used in support of the industrial plant. . . . *Services rendered to machinery and production equipment are not taxable even though such machinery or equipment is considered to be a fixture under Connecticut real property law.*" (Emphasis added.) Section 12-426-11b (7) of the regulations defines an "industrial plant" as a "manufacturing facility at which a manufacturing production process is occurring." The regulations define both "manufacturing"[5] and "manufacturing production process"[6] as activities that "shall occur solely at an industrial plant." The taxpayer contends that services rendered to the components of its elec-

[5] Section 12-426-11b (10) of the Regulations of Connecticut State Agencies defines "manufacturing" as follows: " 'Manufacturing' shall mean the performance as a business of an integrated series of operations which places personal property in a form, composition or character different from that in which it was acquired for sale in the regular course of business by the manufacturer. The change in form, composition, or character must be a substantial change, and it must result in a transformation of property into a different product having a distinctive name, nature and use. Operations such as compounding or fabricating are illustrative of the types of operation which may result in such a change. 'Manufacturing' is an activity which shall occur solely at an industrial plant."

[6] Section 12-426-11b (11) of the Regulations of Connecticut State Agencies provides: " 'Manufacturing production process' shall mean any one of a series of production activities, beginning with the movement of the raw materials after their receipt, inspection and storage, to the first production machine and ending with the completion of the finished product, including any packaging operations, for its sale to the ultimate consumer. 'Manufacturing production process' shall not include any activities prior to the first production stage (such as collecting, weighing and storing raw materials) or any activities following the last production stage (such as casing, loading or delivering to the consumer). 'Manufacturing production process' shall occur solely at an industrial plant."

tricity generating facilities are exempt from the sales tax because the generation of electricity is "manufacturing."

Whether the generation of electricity constitutes manufacturing for the purposes of a sales tax exemption is a question of first impression in this state. In determining this question, we need not undertake a scientific discussion of the nature of electricity or its generation by mechanical means. See, e.g., *Frederick Electric Light & Power Co.* v. *Frederick*, 84 Md. 599, 600–602, 36 A. 362 (1897). Rather, we rely on the legislative history and construction of the Sales and Use Tax Act as a whole for our conclusion that electricity generation is not manufacturing.[7] While the generation of electricity may in some sense be a "manufacturing" process, we conclude that the legislature did not intend to exempt businesses engaged in the generation of electricity for public consumption from the tax on services rendered to machinery and production equipment under § 12-407 (2) (i) (I).

In construing any statute, we seek to ascertain and give effect to the apparent intent of the legislature. *Tex-*

---

[7] Other jurisdictions have relied on legislative intent to hold that the generation of electricity is not manufacturing for the purpose of a tax exemption. See *State* v. *New Orleans Ry. & Light Co.*, 116 La. 144, 150, 40 So. 597 (1906); *Frederick Electric Light & Power Co.* v. *Frederick*, 84 Md. 599, 600–603, 36 A. 362 (1897); *Commonwealth* v. *Northern Electric Light & Power Co.*, 145 Pa. 105, 118–21, 22 A. 839 (1891). As the court stated in *Frederick Electric Light & Power Co.* v. *Frederick*, supra, 600–602: "In determining [the question of whether an electric light company is a manufacturing industry], we do not deem it necessary to attempt a scientific discussion of what electricity is. . . . Whether an electric light company can properly be said to 'manufacture' electricity or whether it simply brings into action that which is already made, we need not determine. The Mayor and Aldermen of Frederick have . . . undertaken to exempt certain property from municipal taxation and we are simply to determine whether the appellant can reasonably be said to be within the meaning and intention of this legislation."

*aco Refining & Marketing Co.* v. *Commissioner,* 202 Conn. 583, 589, 522 A.2d 771 (1987), "In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." Id.

Starting with the language of the statute itself, as we must; see, e.g., *Lundy Electronics & Systems, Inc.* v. *Tax Commissioner,* 189 Conn. 690, 695, 458 A.2d 387 (1983); we note that § 12-407 (2) (i) (I) refers to "commercial, industrial and income-producing real property." The legislative history of No. 75-213 of the 1975 Public Acts, which enacted the provision, does not clarify the meaning of the term "industrial real property." The regulations define "industrial real property" as an "industrial plant"; Regs., Conn. State Agencies § 12-426-26 (d); which is in turn defined as a "manufacturing facility at which a manufacturing production process is occurring." Regs., Conn. State Agencies § 12-426-11b (7). The regulatory definition of "manufacturing" is ambiguous as to whether the generation of electricity is included. See footnote 5, supra.

Where particular words or sections of a statute, considered separately, are imprecise, we may look to the expressed intent of the statute as a whole. *State* v. *Burney,* 189 Conn. 321, 326, 455 A.2d 1335 (1983); see also *Ruskewich* v. *Commissioner of Revenue Services,* 213 Conn. 19, 25, 566 A.2d 658 (1989). Thus, in construing the terms "industrial real property," as used in § 12-407 (2) (i) (I), and "manufacturing," as referred to in the regulations promulgated thereunder, we consider other sections of the Sales and Use Tax Act which contain similar language.

The Sales and Use Tax Act was enacted in 1947 and 1948.[8] The act singled out the furnishing of electricity for special treatment in several places. First, the act exempted from taxation the sales, furnishing or service of electricity, and gas, water, telephone and telegraph, "when delivered to consumers through mains, lines or pipes."[9] General Statutes (1947 Rev.) § 334i (c). In addition, the act separately exempted materials, tools and fuel used in the generation of gas, water, steam or electricity for distribution to consumers, and materials, tools and fuel used in "an industrial plant in the process of the manufacture of tangible personal property."[10] General Statutes (1949 Rev.) § 2096 (r).

[8] Public Acts 1947, No. 228; Public Acts, Spec. Sess., February, 1948, No. 1, §§ 5, 6, 7. The original enactment contained no provision for the tax on services at issue in this appeal.

[9] Public Acts 1947, No. 228, § 7. In 1989, this section was amended to exempt, among other things, electricity used directly in an "industrial manufacturing plant." Public Acts 1989, No. 89-251, § 12. During the House debate, Representative David Lavine, who introduced a successful amendment to revise the method of determining eligibility for the exemption, stated that the commissioner would use "SIC codes" to determine whether a given taxpayer qualified as an "industrial manufacturing plant." 32 H.R. Proc., Pt. 29, 1989 Sess., pp. 10,159–60. "SIC codes" refers to the categories set forth in the Standard Industrial Classification Manual periodically published by the United States Office of Management and Budget. Reliance on the SIC codes would exclude public utilities engaged in the generation of electricity from the term, "industrial manufacturing plant," as the SIC Manual (1972 and 1987 Eds.) separates manufacturing industries (Codes 2011 to 3999) from public utilities, including "[e]stablishments engaged in the generation, transmission, and/or distribution of electric energy for sale" (Code 4911).

See also General Statutes § 12-412d, added by Public Acts 1986, No. 86-397, which refers the commissioner to code classifications 3000 to 3999, inclusive, of the Standard Industrial Classification (SIC) Manual (1972 Ed.) to determine whether a taxpayer qualifies for a refund for repair and replacement parts to be used in machinery used directly in a "manufacturing production process."

[10] General Statutes (1949 Rev.) § 2096 (r), enacted by Public Acts, Spec. Sess., February, 1948, No. 1, § 7, provided in relevant part: "PRODUCTION MATERIALS. Sales of and the storage, use or other consumption of materials, tools and fuel or any substitute therefor, *but excluding machinery or replacement parts thereof used in production* . . . which are consumed

The special treatment of electric companies and other public utilities suggests that the act's drafters considered such industries to be distinct from manufacturing concerns. In addition, such separate treatment implies a legislative intent not to exempt public utilities from other sections of the act unless expressly exempted.[11] Finally, the separation of the "furnishing of electricity" from the "manufacture of tangible personal property" in the second provision supports an inference that the term, "industrial plant," excludes facilities devoted to the generation of electricity for public consumption.[12]

and used directly in . . . an *industrial plant in the process of the manufacture of tangible personal property* to be sold. Sales of and the storage, use or other consumption of materials, tools and fuel or any substitute therefor, *but excluding machinery or replacement parts thereof used in production,* when such products are used and consumed directly in the furnishing of power to an industrial manufacturing plant or in the furnishing of . . . electricity when delivered to consumers through mains, lines or pipes." (Emphasis added.) This provision of the act is now codified as General Statutes § 12-412 (18).

[11] This court construed the original provision exempting the sale of public utilities to consumers as follows: "The exemption is of 'the sales, furnishing, or service of, gas, water, electricity, telephone and telegraph,' and it is, therefore, an exemption only from the sales tax. It does not, however, exempt such companies generally from that tax but only as regards service delivered to customers 'through mains, lines or pipes.' *The careful delineation of the bounds of this exemption gives unusual force to the principle that the express mention in a statute of one exemption precludes reading others into it.* . . . The provision unmistakably shows a legislative intent that, as to sales other than those specified, public utility companies should be subject to the sales tax, and shows that there was no intent to exempt them generally from that tax." (Emphasis added.) *Connecticut Light & Power Co.* v. *Walsh,* 134 Conn. 295, 301, 57 A.2d 128 (1948).

[12] The minimal legislative history available on the exemption for materials, tools and fuel supports such an interpretation. At a hearing on the sales tax bill, state tax commissioner Walter W. Walsh explained the exemption for materials, tools and fuel as follows: "If the article purchased is for *tangible property* to be produced for sale, assembling or processing or whatever is consumed in such cases and no tax should be on the material. A purchase of oil which is going into a machine making up *things* is not taxed. Parts making up *things* eventually used for resale, no tax. Many parts incorporated into the same for parts to be sold, no tax." (Emphasis added.) Conn.

Machinery was expressly excluded from the original exemption for materials, tools and fuel. See footnote 10, supra. In 1978, the legislature deleted the language excluding machinery and added a new subsection, now codified as § 12-412 (34), which exempted "machinery . . . used directly in a manufacturing production process."[13] "[A] legislative act must be read as a whole and construed to give effect and to harmonize all of its parts . . . ." *Eighth Utilities District* v. *Manchester,* 176 Conn. 43, 50, 404 A.2d 898 (1978). The legislative history of § 12-412 (34) therefore guides us in determining what constitutes "manufacturing" for the purposes of the exemption from § 12-407 (2) (i) (I) claimed by the taxpayer.

Senator Audrey P. Beck, the sponsor of the bill to eliminate the sales tax on machinery and equipment, gave the following two reasons in support of the legislation: "The first is that in the judgment of the Committee, *the sector of the business community having the greatest difficulties is the manufacturing sector and, therefore, by eliminating the sales tax on machinery and equipment, we feel that we will be stimulating the*

Joint Standing Committee Hearings, Finance, 1947 Sess., p. 46. The statute as revised exempts materials used "in the actual fabrication of the finished product to be sold" rather than "in the manufacture of tangible personal property to be sold." General Statutes § 12-412 (18). Nevertheless, the commissioner's references to the production of "tangible property" and "things" as manufacturing suggests that the drafters did not intend the generation of electricity, which was separately exempted, to constitute manufacturing at an industrial plant.

[13] No. 78-71, § 4, of the 1978 Public Acts added the following subsection to the Sales and Use Tax Act: "(gg) Sales of and the storage, use or other consumption of machinery used directly in a manufacturing or agricultural production process. The word 'machinery' as used in this subsection means the basic machine itself, including all of its component parts and contrivances, such as belts, pulleys, shafts, moving parts, operating structures and all equipment or devices used or required to control, regulate or operate the machinery, but excluding office equipment or data processing equipment other than numerically controlled machinery used directly in the manufacturing process."

*manufacturing sector to modernize, to improve, to remain efficient and competitive* and, secondly, in terms of the sales by those companies, which are selling such equipment, we feel that by completely eliminating this tax, we will also stimulate their own sales of that equipment."[14] (Emphasis added.) During House debate on the bill, the House Chairman of the Joint Committee on Finance, Representative Gardner E. Wright, Jr., referred to the elimination of the tax as "an encouragement and an inducement for manufacturers in the state of Connecticut," citing United Technologies as the largest manufacturer in the state.[15]

The legislative intent is further illuminated by comments made by Representative Wright at public hearings of the Joint Standing Committee on Finance.[16] In response to a question about the meaning of "manufacturing" under the act,[17] Representative Wright stated: "Let me try to explain a little bit of the rationale about what we did. We had limited number of dollars to work with and we felt that it was our purpose and our intention to put those tax incentives where we thought they

[14] 21 S. Proc., Pt. 3, 1978 Sess., p. 1151. This court has recognized that the statement of the legislator who reported the bill out of committee is entitled to particular weight and careful consideration in discerning legislative intent. *Robinson* v. *Unemployment Security Board of Review,* 181 Conn. 1, 15 n.4, 434 A.2d 293 (1980).

[15] 21 H.R. Proc., Pt. 5, 1978 Sess., pp. 1948–49. Representative Arthur Della Vecchia also expressed support for the bill, noting that "presently the tax discourages the expansion of industry in our State." He commended the Joint Committee on Finance for being "aware of the problems facing the manufacturers in our State" and "acting constructively to create a better climate for business and industry." Id., pp. 1963–64.

[16] While we generally review a statute's legislative history based on the Senate and House debates, we may also consider discussions before a joint standing committee when discerning legislative intent. *North Haven* v. *Planning & Zoning Commission,* 220 Conn. 556, 564 n.11, 600 A.2d 1004 (1991).

[17] Statement of Warren Seder, president of the Connecticut Dispensing Company and member of the board of directors of the Connecticut Automatic Merchandising Council. Conn. Joint Standing Committee Hearings, Finance, Pt. 2, 1978 Sess., pp. 547–49.

would do the most good in the expansion of jobs in the state of Connecticut, and *we felt the manufacturing industry where we produced goods for sale* outside of the state of Connecticut or even to other manufacturing industries or concerns within the state, it *would provide us with the greatest return, and that if we were to encourage expansion and development in the true manufacturing industries, we would encourage expansion of jobs in Connecticut,* and that's why." (Emphasis added.) Conn. Joint Standing Committee Hearings, Finance, Pt. 2, 1978 Sess., p. 549. He suggested that proposed new plants for J.C. Penney and Union Carbide would provide "true manufacturing jobs." Id., p. 551.

The legislative history of § 12-412 (34) demonstrates that the elimination of the sales tax on machinery and equipment was intended to encourage the growth and development of "true" manufacturing industries in Connecticut. See *Phelps Dodge Copper Products Co.* v. *Groppo,* 204 Conn. 122, 135, 527 A.2d 672 (1987). We conclude that the exemption claimed by the taxpayer pursuant to § 12-426-26 (d) of the Regulations of Connecticut State Agencies, for services rendered to machinery and equipment at an industrial plant, was motivated by the same concerns.[18] "[W]ould the term

[18] We reach this conclusion in part because § 12-426-26 (d) of the regulations, as well as the other regulations relevant to this appeal, took effect on April 7, 1980, only two years after General Statutes § 12-412 (34) was enacted. Moreover, the definitions set forth in § 12-426-11b of the regulations, including the definition of "manufacturing," apply to both §§ 12-412 (34) and 12-407 (2) (i) (I). We also find support in the administrative interpretation of § 12-412 (34) by the commissioner. "This court pays considerable deference to the commissioner's interpretation of tax statutes and regulations." *Ruskewich* v. *Commissioner of Revenue Services,* 213 Conn. 19, 24, 566 A.2d 658 (1989). In particular, the "time-tested" administrative interpretation of a statute is entitled to great weight when it is both reasonable and consistent with the overall statutory scheme. *Texaco Refining & Marketing Co.* v. *Commissioner,* 202 Conn. 583, 589, 522 A.2d 771 (1987). We accord significant weight, therefore, to the fact that, since as early as January 1, 1982, the commissioner has treated all *purchases* of machinery by utility companies, including electric-

'manufacturing industries' strike the mind of the average man, when used in the above connection as including an electric light plant?" *Frederick Electric Light & Power Co.* v. *Frederick,* 84 Md. 599, 601, 36 A. 362 (1897). "In the ordinary popular meaning of the word, a corporation which operates gas or electric works is not a 'manufacturer,' and is not so styled, though, scientifically speaking, gas or electricity may be a product of manufacture." *State* v. *New Orleans Ry. & Light Co.,* 116 La. 144, 149, 40 So. 597 (1906). The history of § 12-412 (34) makes clear that the "manufacturing industries" exempted from taxes on the purchase of machinery and equipment and services rendered thereto were "intended to be such as might go elsewhere"; *Frederick Electric Light & Power Co.* v. *Frederick,* supra, 602; not those, like a public power utility, that would ordinarily be expected to remain in this state. The inducements provided by the exemptions in § 12-412 (34) and § 12-426-26 (d) of the regulations therefore do not apply to businesses engaged in the generation of electricity. See id., 602–603. We conclude that the legislative purpose is not served by exempting such businesses from the tax on services rendered to machinery and production equipment.

The case law in other jurisdictions supports our conclusion that machinery and equipment used for the generation of electricity is not "machinery and production equipment" at an "industrial plant" pursuant to § 12-426-26 (d) of the Regulations of Connecticut State Agencies because the generation of electricity is not "manufacturing" within the meaning of the Sales and Use Tax Act.[19] The commissioner properly calls our

ity generation machinery, as taxable, and thus non-exempt pursuant to § 12-412 (34). See Connecticut Sales and Use Tax Manual § 20.18.13. The taxpayer's claim that services rendered to this same machinery are exempt from taxation contradicts this "time-tested" administrative interpretation.

[19] See *State* v. *New Orleans Ry. & Light Co.,* 116 La. 144, 40 So. 597 (1906) (electric company not a "manufacturer" within meaning of clause

attention to a decision of the Pennsylvania Commonwealth Court; *Potomac Edison Co.* v. *Commonwealth,* 50 Pa. Commw. 1, 411 A.2d 1287, aff'd, 491 Pa. 432, 421 A.2d 214 (1980), appeal dismissed, 451 U.S. 901, 101 S. Ct. 1965, 68 L. Ed. 2d 289 (1981); for the proposition that the generation of electricity is not manufacturing. In *Potomac Edison Co.,* the court reviewed the taxpayer's appeal from an adverse administrative decision. In the absence of a statutory definition, the court defined "manufacturing" as "the application of labor or skill to material whereby the original article is changed into a new, different and useful article . . . ."

in state constitution exempting manufacturers from license taxes); *Frederick Electric Light & Power Co.* v. *Frederick,* 84 Md. 599, 36 A. 362 (1897) (electric light company is not "manufacturing industry" within meaning of exemption from municipal taxation); *Commonwealth* v. *Northern Electric Light & Power Co.,* 145 Pa. 105, 22 A. 839 (1891) (company that generates electricity is not "manufacturing company" within meaning of statutory exemption for capital stock of manufacturing companies); *Potomac Edison Co.* v. *Commonwealth,* 50 Pa. Commw. 1, 411 A.2d 1287, aff'd, 491 Pa. 432, 421 A.2d 214 (1980), appeal dismissed, 451 U.S. 901, 101 S. Ct. 1965, 68 L. Ed. 2d 289 (1981) (electric company is not entitled to manufacturing exemption from franchise tax); but see *Curry* v. *Alabama Power Co.,* 243 Ala. 53, 8 So. 2d 521 (1942) (corporation engaged in generation and distribution of electricity is a "manufacturing corporation" within meaning of use tax act provision exempting machines used in manufacturing tangible personal property); *Morley* v. *Brown & Root, Inc.,* 219 Ark. 82, 239 S.W.2d 1012 (1951) (dam to be used for generation of electricity is "manufacturing facility" within meaning of use tax act exemption); *Kentucky Electric Co.* v. *Buechel,* 146 Ky. 660, 143 S.W. 58 (1912) (electric company was "manufacturing establishment" within meaning of city ordinance exempting such establishments from taxation); *In re Answer of Minnesota Power & Light Co.,* 289 Minn. 64, 182 N.W.2d 685 (1970) (electricity is "manufactured, marketable product" within meaning of property tax exemption for tools and machinery used in the manufacture of "marketable products"); *Department of Revenue* v. *Puget Sound Power & Light Co.,* 179 Mont. 255, 587 P.2d 1282 (1978) (electricity generation is "manufacturing process" and, therefore, generating complex is "new industrial property" within meaning of statute providing special property tax treatment); *People ex rel. Brush Electric Mfg. Co.* v. *Wemple,* 129 N.Y. 543, 29 N.E. 808 (1892) (electric company was "manufacturing company" within statutory exemption from corporation taxes).

(Internal quotation marks omitted.) *Potomac Edison Co.* v. *Commonwealth,* supra, 411 A.2d 1290. The court stated that the legal concept of "manufacturing" requires both a "substantial" change and the continued existence of the original, tangible material in the finished product. Id. Relying on this definition, the court concluded that the process of electricity generation was not manufacturing because "no molecules of the original raw material survive in the final product." Id., 1291.

The taxpayer refers us, however, to a decision of the Supreme Court of Minnesota which held that electricity is a "manufactured, marketable product" for the purposes of a property tax exemption. *In re Answer of Minnesota Power & Light Co.,* 289 Minn. 64, 75, 182 N.W.2d 685 (1970). The Minnesota law at issue exempted "[t]ools and machinery which by law is considered as personal property used or useable in . . . the manufacture, processing, production, sale or distribution of marketable products . . . ." (Internal quotation marks omitted.) Id., 67. In dicta, the court reviewed with approval earlier Minnesota decisions and decisions from other jurisdictions which held that electricity generation is manufacturing. Id., 72–73. The holding in *In re Answer of Minnesota Power & Light Co.,* however, turned on the question of whether electricity is a "marketable product" within the meaning of the statutory exemption. Id., 73–75.

The definition of manufacturing in *Potomac Edison Co.* v. *Commonwealth,* supra, is substantially similar to the definition set forth in § 12-426-11b (10) of the Regulations of Connecticut State Agencies. See footnote 5, supra. Nevertheless, we reject as unnecessarily technical the reasoning of the Pennsylvania court in that case. The holding of *In re Answer of Minnesota Power & Light Co.,* supra, is inapplicable because it did not depend, as does the exemption claimed by the tax-

payer in the present case, upon a determination of whether electricity generation constitutes manufacturing.

The taxpayer bears the burden of proving the error in an adverse assessment concerning an exemption. *Plastic Tooling Aids Laboratory, Inc.* v. *Commissioner of Revenue Services,* supra, 369. Where there is any ambiguity in the applicability of an exemption, we must uphold the assessment of the commissioner. Id. The taxpayer in the present appeal has not sustained its burden. We therefore reverse the decision of the trial court in favor of the taxpayer. We agree with the taxpayer, however, that a remand to the trial court is necessary for a factual determination of the nature of the subject property. See footnote 4, supra.

The judgment is reversed and the case is remanded for further proceedings.

In this opinion the other justices concurred.