29351. FORRESTER, commissioner, for use, *v.* NORTH GEORGIA ELECTRIC MEMBERSHIP CORPORATION.

780

DECIDED FEBRUARY 28, 1942. REHEARING DENIED MARCH 11, 1942.

*Gleason & Collins,* for plaintiff.

*R. Carter Pitlman,* for defendant. *Will Ed Smith, William A. Slaton, Thomas J. Murray,* for persons at interest.

SUTTON, J. On March 12, 1941, J. M. Forrester, commissioner of the Department of Revenue, issued, for the use of Walker County, Georgia, three executions against North Georgia Electric Membership Corporation, covering taxes assessed for the years 1938, 1939, and 1940, with interest. These executions were, by the sheriff of Walker County, levied on certain property of the corporation, which thereupon filed an affidavit in which it was contended that the executions were proceeding illegally in that the corporation was exempt from county taxation, under the provisions of Code § 2-5003, for such years, the provisions of the Code having been made effective in Walker County, and the corporation having, after January 1, 1924, built a plant for the production or development of electricity in said county. Under an agreed statement of facts the case was referred to the court for decision without the aid of a jury. The court rendered judgment sustaining the affidavit of illegality, and the exception here is to that judgment.

The following portions of the agreed statement of facts are sufficient for a determination of the issue: "9. That the amount set forth in said tax executions is true and correct and owing by the North Georgia Electric Membership Corporation unless the North Georgia Electric Membership Corporation is exempt from taxation in the County of Walker for a period of five (5) years, as claimed in said affidavit of illegality. 10. That the provisions of § 2-5003 [of the Code] . . are effective in Walker County, Georgia, and that by reason of this constitutional provision the North Georgia Electric Membership Corporation contends that its poles, lines, and distribution system is exempt for the reason that it contends that it has built, equipped, established, and enlarged a plant for

the production or development of electricity within the meaning of the foregoing provision of the constitution. 11. It is further agreed between the parties that the provisions of the constitution quoted above have been made applicable to Walker County. That an election was duly held in Walker County, and the terms and provisions of all statutes providing for the election, advertisement thereof, ballots, returns and other essentials thereof, have all been complied with, and that the results of the election have been declared and entered upon the minutes of the court of ordinary of Walker County as prescribed by § 92-209, Ga. Code annotated, and that any plant coming within the terms of the constitutional provision hereinbefore quoted is exempt from taxation for a period of five (5) years in Walker County, Georgia. 12. It is further agreed that the North Georgia Electric Membership Corporation does not own or operate turbines, water-power plants, or electric generators; that it does not produce the electricity transmitted through its lines and transmission system throughout north Georgia in the sense of generating and/or producing the same, but it transforms electricity so as to make it available for use by its members. It is agreed that the North Georgia Electric Membership Corporation purchases from Tennessee Valley Authority electrical energy which is transmitted to it at 44,000 volts; that this electrical energy is transmitted to a certain point over wires and transmission systems of the Tennessee Valley Authority until it reaches a certain transformer or transformers owned by the North Georgia Electric Membership Corporation; that after said electrical energy reaches the transformers of the North Georgia Electric Membership Corporation it is then transformed first to 11,000 volts and transmitted over the lines and distribution system of the North Georgia Electric Membership Corporation, and again transformed to 110 volts for use by its various consumers and members throughout North Georgia and Walker County. A transformer is a device into which electrical current flows, and is thereby transformed through an induction coil employed for either raising or lowering electric pressure. . . 15. The North Georgia Electric Membership Corporation has approximately 125 miles of lines in Walker County, approximately 300 transformers, and one substation, representing an investment of approximately $135,000 and serving approximately 1050 members of the co-operative. Walker County lines are segments of a

greater system embracing 750 miles of distribution lines serving 5600 consumers in seven counties in the north Georgia area, and the co-operative pays taxes in Catoosa and Floyd Counties, wherein the constitutional provision hereinbefore quoted has not been put into effect. The total investment of the co-operative in such distribution facilities amounts to approximately $850,000."

By agreement of the parties the following provisions of the charter of the corporation were introduced in evidence: "Objects and purposes. The object or purpose for which this corporation is formed is to promote and encourage the fullest possible use of electric energy by making such energy available to its stockholders at the lowest cost consistent with sound economy and the prudent management of the business of the corporation, and without profit. Without in any manner restricting or limiting the foregoing, the purpose of the corporation shall include the following: To purchase, acquire, and accumulate electric energy for its stockholders and to transmit, distribute, furnish, sell, and dispose of such electric energy to its stockholders only, and, in order to carry out and accomplish any or all of such purposes, to construct, erect, purchase, lease, and in any manner acquire, own, hold, maintain, operate, sell, dispose of, lease, exchange, and mortgage plants, buildings, works, machinery, equipment, and supplies and electric transmission and distribution lines of systems. To acquire, own, hold, exercise, and to the extent permitted by law, to mortgage, pledge, hypothecate, and in any manner dispose of franchises, rights, priviliges, licenses, and easements necessary, useful, or convenient for carrying out and accomplishing of any of the purposes of the corporation. To purchase, lease, and in any manner acquire, own, hold, maintain, sell, lease, exchange, mortgage, pledge, and in any manner dispose of any and all real and personal property which may be necessary, useful, or convenient for the carrying out and accomplishing of any of the purposes of the corporation. To assist its stockholders to wire their premises and install therein electrical and plumbing appliances, fixtures, machinery, supplies, apparatus and equipment of any and all kinds and character, and, in connection therewith and for such purposes, to purchase, acquire, lease, sell, distribute, install, and repair electrical and plumbing appliances, fixtures, machinery, supplies, apparatus, and equipment of any and all kinds and character, and to receive, acquire, endorse,

pledge, hypothecate, and dispose of notes and other evidences of indebtedness. . . To make available electric transmission facilities to other corporations not for profit organized for similar purposes under the statutes of the State of Georgia, or any other State of the United States, and which shall be stockholders of the corporation, by sale, lease, contract, or otherwise. To do all such acts and things as may be useful, necessary, or convenient for the accomplishment of the purposes in this article expressed, or any of them, and to possess and be authorized to exercise and enjoy all of the powers and all rights and privileges granted to or conferred upon corporations of the character of this corporation by the laws of the State of Georgia now or hereafter in force; provided, however, that all of the operations of the corporation shall be on a co-operative basis, not for profit, and for the use and benefit of its stockholders."

The Code, § 2-5003, under which the defendant claims exemption from taxation in Walker County, provides as follows: "Any person, natural or artificial, a resident of this State, who may after January 1st, 1924, build, equip, establish or enlarge a plant for the manufacture or processing of cotton, wool, linen, silk, rubber, clay, wood, metal, metallic or non-metallic mineral or combination of same, creamery or cheese plant; or for the production or development of electricity, may, as to such building, enlargement, or equipment, be exempt from all county, incorporated town or city ad valorem taxes for a period of time not exceeding five years from the date of the beginning of the building, enlargement or equipment of such plants. The legislature is herewith empowered to make provisions for the operation of this paragraph by appropriate legislation, provided such exemptions shall be approved by a majority of the electors voting in such county, incorporated town or city proposing said exemption." The plaintiff contends that under the agreed statement of facts the court erred in holding that the defendant had built a "plant" for the production or development of electricity, the equipment being merely a facility for the distribution of electricity. The defendant claims that, though it is not *producing* electricity, it is *developing* it by means of the equipment it has built. The defendant has no turbines, water-power plants or electric generators, but it has poles, lines, transformers, and a substation. It is not contended that the substation is gen-

erating electricity. The function of the plant or equipment which the defendant has built since January 1, 1924, may be understood from the following brief analysis which is based on the agreed statement of facts: The electricity which is ultimately used by the members of the so-called "co-operative" is generated by the Tennessee Valley Authority in Tennessee. It is purchased by the defendant co-operative and is transmitted at 44,000 volts over the wires and system of the Tennessee Valley Authority to an initial transformer of the defendant, where for the first time the defendant's equipment begins to operate. The transformer, as appears in the agreed statement of facts, is "a device into which electrical current flows, and is thereby transformed through an induction coil employed for either raising or lowering electric pressure." This definition is in accord with the usual description of a transformer, which, as stated in 29 C. J. S. 480, § 1, is "an apparatus which, by the utilization of the phenomena of magnetic induction, is used for the changing of the ratio of electric potention, or voltage, from a higher to a lower value, or vice versa, the former being known as a 'step-down transformer,' the latter as a 'step-up transformer;' but when there is no qualifying adjective the term is generally taken to mean a step-down transformer, and it has been described as a mechanism used to reduce the voltage carried by the main conductor." By the initial transformer of the defendant the purchased electricity is reduced or broken down to 11,000 volts, and is then conveyed or transmitted over the lines and distributive system of the defendant to other transformers which further reduce or break down the voltage to 110 volts for use by, the various customers and members of the defendant co-operative in Walker County and other sections of North Georgia. Now, in doing this, has the "plant" or equipment of the defendant developed electricity?

It is argued by the defendant that the word "develop" should not be limited in meaning to "produce," and that one of several definitions given by Webster, "to make more available or usable," is quite applicable here; that the "development" of electricity consists in a process or function of taking from a producer an electric current of 44,000 volts and by a mechanical device, called a transformer, breaking it down or reducing it to 11,000 volts and by a further transformer or transformers breaking it down or reduc-

ing it to 110 volts, thus making the energy produced by another in higher voltage available to 1050 consumer members of the defendant in Walker County, rendering "an intangible increment, attracting new residents, new industries, and augmenting the value of the property already existing in the community." The benefits conferred by the defendant can not be gainsaid, but does the contribution to the welfare of the community amount to a "development" of electricity? We think not. When the constitutional amendment, embodied in Code, § 2-5003, was proposed to the people there were, by common knowledge, within the State, many miles of wires, many poles, transformers, and such like facilities which might make possible the conveyance or distribution of electricity generated or produced by a plant designed for such purpose in Georgia or in a neighboring State. So we are of the opinion that the framers of the constitutional provision, having such facts in mind, contemplated, not the mere distribution of electricity in original or reduced voltage, but the construction, equipment, establishment or enlargement of a plant for the production or development of electricity, the operation of which would obviate the necessity of bringing into this State electric power, which had been generated elsewhere, and then distributing it; in other words, what was contemplated was a plant which would as an original undertaking in Georgia produce or develop, harness or seize that mysterious force, called electricity, which is said to be in the sky and the ground about us.

Cases and text-books relating to tax exemption of new industries are, as stated in the brief of counsel for the defendant, concerned mainly with the construction of the word "manufacture" as used in the statutes. Others involve the question whether or not property related to and incident to the main business of manufacturing is covered by the exemption statute. Some courts have held that electricity can not be manufactured; that it is already in existence. Others have held that as the electric force or power which comes from a "generating" device is so unlike that which is said to be present in a natural state it may reasonably be held that it has been "manufactured." The applicable portion of our statute provides for exemption from taxation of the building, enlargement, or equipment of a plant for the production or development of electricity. Consequently, the cases we have examined do not furnish

a precedent for the question here presented. While not exactly in point Kentucky Electric Co. v. Buechel, 146 Ky. 660 (143 S. W. 58, 38 L. R. A. (N. S.) 907, Ann. Cas. 1913C, 714), may be noted in connection with the nature of the equipment here sought to be exempted from taxation. As stated in the report, "The Kentucky Electric Company is a Kentucky corporation, organized to engage in the manufacture and sale of electricity in the City of Louisville. In 1906 it obtained a franchise from the city, permitting it to use the streets thereof for its conduits, poles and wires, used in the distribution of electricity to its patrons throughout the city. At or about the same time it constructed a large plant and began to actively carry on its business. The city assessor was proceeding to assess its property for taxes, and, conceiving that, under section 170 of the constitution, section 2980-a of the statutes, and an ordinance approved by the general council of the City of Louisville July 29, 1898, its property was exempt from taxes, it sought by suit to have the assessor enjoined from assessing its property in the City of Louisville. Upon hearing the trial court refused to grant the injunction, upon the ground that while the appellant was a new business or enterprise in the City of Louisville, it was not a manufacturing plant within the meaning of the State law and the ordinance of the City of Louisville passed to carry it into effect, whereby new manufacturing plants located in Louisville are exempt from taxation for a period of five years. Appellant's petition being dismissed, it seeks a reversal here. Three questions are raised upon appeal: first, is appellant a manufacturing plant; second, if so, is there anything in the language of the statute or the ordinance denying it the benefit of the exemption; and, third, if it is entitled to the exemption, how much of appellant's property is covered by the words 'manufacturing establishment' as used in the ordinance." In the opinion it was said: "Clearly, the ground upon which the manufacturing plant is located, the building erected thereon, and the machinery and appliances used therein in generating or manufacturing the electricity. Its poles, conduits, lines, wires, etc. are not used in any way whatever in the manufacture of the electricity, but their use is to dispose of the manufactured product, just as the horses and wagons and drays of a box factory might be used in removing the boxes when manufactured from the factory to the warehouse or purchasers. While they may be neces-

sary to make the business a success, still they are not necessary to manufacture the product, and the ordinance is silent upon the question of the sale or disposition of the manufactured product. It offers no inducement in the way of exempting from taxation property used in disposing of the output of the factory. We therefore hold that appellant is conducting a manufacturing business in the City of Louisville, that it is a new business, located there since the passage of the ordinance, and that, having complied with the terms of the ordinance as to notice, etc., it is entitled to the benefit of the five years' exemption from taxation on its manufacturing plant. It is not entitled to exemption on any of the property by it [used] in distributing, selling and disposing of its manufactured produce [product?], hence its poles, wires, conduits, and other property outside of its factory proper are subject to taxation for the years in question." This distinction was apparently approved by our Supreme Court in referring to it in its opinion in *City of Columbus* v. *Muscogee Mfg. Co.*, 165 *Ga.* 259 (140 S. E. 860), in which, in dealing with the constitutional provision here involved, it was held that where a resident corporation, which owns and operates a cotton factory, purchases existing warehouses for the storage of cotton to be manufactured at its factory and for storage of its finished product, such warehouses, not being used in the manufacture or processing of the corporation's product, though convenient thereto, were not exempt from taxation.

Our conclusion that the defendant's equipment is used for distribution and not for the development of electricity is reenforced by a rule of construction that the meaning of each word is to be considered in the light of its associate. *Georgia Warehouse Co.* v. *Jolley*, 172 *Ga.* 172, 174 (157 S. E. 276). Under this rule the word "develop" must be treated as synonymous with the associate word "produce," and so treated has reference to producing or generating, and not to the mere act of breaking down or reducing to less voltage a current of electricity which has been produced or generated by another. If the framers of the constitutional provision had intended to exempt from taxation persons or corporations who made more available or usable or distributed electricity, it would have been an easy matter for them to have used language clearly expressive of such intention.

Our view also finds support in the well-known rules of construc-

tion applicable to statutes exempting property from taxation. Some of these, as stated in *City of Columbus* v. *Muscogee Mfg. Co.*, supra, are: "We should look diligently for the intention of the framers of this constitutional amendment, and give effect to such intention." "It is a cardinal rule in the construction of grants by the public, whether such grants be by statute or by the constitution, that nothing passes by implication, that exemption from taxation will be strictly construed in favor of the public, and that such exemption will not be held to be conferred unless the terms of the grant clearly and distinctly show that such was the intention of the framers of the constitution, or of the legislature in enacting a statute granting special privileges." "The rule of strict construction must not be pushed to the extent of unreasonableness; and it is the duty of the court to ascertain and carry out the intention of the legislature." "Their ordinary signification should be applied to words used in this constitutional provision."

We do not think that the language of the constitutional provision "clearly and distinctly" shows that it was the intention of its framers that property, which is merely used to break down or reduce and then distribute a current of electricity which has been generated by another, should be exempt from taxation. This involves no construction "to the extent of unreasonableness," especially when the word "develop" is, under the general rule of construction, treated in connection with its associate word "produce." The equipment of the defendant, not being shown to be used for producing or developing electricity, was not exempt from taxation in Walker County, and the court erred in sustaining the defendant's affidavit of illegality.

*Judgment reversed. Stephens, P. J., concurs.*

FELTON, J., dissenting. I do not think that the correct rule of construing exemption provisions requires the holdings of the majority in this case. "When it is said that exemptions must be strictly construed in favor of the taxing power, this does not mean that if there is a possibility of a doubt it is to be at once resolved against the exemption. It simply means that if, after the application of all rules of interpretation for the purpose of ascertaining the intention of the legislature, a well-founded doubt exists, then an ambiguity occurs which may be settled by the strict rule of construction. The rule of strict construction does not relieve the

court of the duty of interpreting the exemption by the ordinary rules of construction in order to carry out the intention of the legislature, and does not apply where there is no language in the act justifying or requiring construction. A fair and reasonable construction of the statute or contract must always be adopted, giving the language used its ordinary meaning, and taking into consideration the purpose and spirit of the exemption as well as the public policy entertained at the time and the history of the times when the statute was passed. Strict construction does not require that the narrowest possible meaning be given to words descriptive of the exemption." 2 Cooley on Taxation (4th ed.), 1415, § 674. I think the intendment of the constitutional amendment (which I think is not as much subject to the strict construction rule as a statute, if at all) was to exempt plants built to produce electricity and plants built to develop electricity. The purpose was not merely to encourage producing plants for the benefit of those who were so fortunate as to be near an already existing distribution system, but to bring to those who were removed from distribution lines the benefits to be derived from the distribution and development of electricity. What good is electricity to those who can't use it? To construe "develop" to mean the same as "produce" would be to throw into discard the obvious purpose of the exemption. Why exempt a producing plant and stop there? That is just half the necessary provision for getting electricity where it can be useful to the citizenry. I think producing electricity and transforming electricity are manufacturing it. Yarn exists before a suit of clothes is made, but when its form is changed from spools of thread into clothes they are said to have been manufactured.

But it is not necessary to go even that far. Plants "for producing and developing electricity" are exempted. "Develop" is defined in 26 C. J. S. 1293, as follows: "To devolve, expand, lay open or roll onward or downward; in a sense, to improve; to free from that which enfolds or envelops, to lay open by degrees or in detail, to bring to light by degree, to disclose, to produce or give forth, to uncover or unfold, to work out in detail; to unfold more completely, to evolve the possibilities or power of, to make active (something latent), to make, to increase, to perfect, advance, or further; to promote the growth of. The word signifies an unfolding as distinguished from full determination, or completion, and,

in a particular connection, includes exploration." "Plant" is defined in 48 C. J. 1220, as follows: "It has been defined to be all matters permanently used for the purposes of a trade, as distinguished from the fluctuating stock; every temporary and accessory means necessary or required by an engineer to complete works, and all temporary materials built into the works, which can not, in the opinion of the engineer, be removed without injury to the works; the fixtures, machinery, tools, apparatus, etc., necessary to carry on any trade or mechanical business, or any mechanical operation or process; property owned or used in carrying on some trade or business; a set of machines, tools, etc., necessary to conduct a mechanical business, often including the building and grounds, or in case of a railroad, the rolling-stock, but not including material or product; whatever apparatus is used by a business man for carrying on his business—not his stock in trade which he buys or makes for sale; but all goods and chattels, fixed and movable, live or dead, which he keeps for permanent employment in his business."

The Kentucky case cited by the majority is not persuasive to the contrary. All that case held was that a distribution system was not a part of a manufacturing establishment. The ordinance there did not involve the words "produce" and "develop." The decision in *Georgia Warehouse Co.* v. *Jolly*, cited by the majority, is not authority to the contrary of my view. In the first place, the rule of strict construction was not applied in that case. The plain, normal construction was given to the words "manufacture or process." Process was given the same meaning as manufacture, not because it should always be done, but due to the well-known fact that seed cotton is one thing, and cotton, after ginning, is another. If the exemption had read manufacture or processing of seed cotton, the result would have been different. The case of *Mayor &c. of Gainesville* v. *Brenau College*, 150 *Ga.* 156 (103 S. E. 164) is a shining example of the reasonable construction of an exemption provision rather than a strict and unreasonable one. My conclusion is that if it was intended, as I think it was, to exempt property built to produce and distribute electricity, a plant built either to produce or distribute it is exempt under the provisions under discussion. I dissent from the judgment of reversal.