**HOUSE OF LLOYD, INC., Appellant,**

v.

**DIRECTOR OF REVENUE, STATE OF MISSOURI, Respondent.**

No. 73468.

Supreme Court of Missouri,
En Banc.

Feb. 25, 1992.

Gretchen Garrison, Craig S. O'Dear, Kansas City, for appellant.

William L. Webster, Atty. Gen., Carole L. Iles, Asst. Atty. Gen., Jefferson City, for respondent.

FOREST W. HANNA, Special Judge.

The appellant, House of Lloyd, Inc., filed its petition for review from a decision of the Administrative Hearing Commission (AHC) following an evidentiary hearing. This appeal is from that part of the AHC's decision that was adverse to the appellant, House of Lloyd, and involved taxes, interest, and penalties of sales tax in the amount of $58,861.94 and use tax totalling $257,653.55 paid under protest by the appellant. Those taxes covered the period of July 1985 through June 1986. The taxpayer now seeks recovery of those amounts, which the AHC determined the Director of Revenue could lawfully retain. The refund ordered by the AHC is not an issue on this appeal.

Article V, § 3 of the Missouri Constitution provides this Court the exclusive appellate jurisdiction to construe Missouri revenue laws. Where a question of law is involved, it is a matter for the independent judgment of the reviewing court. *Jackson Excavating Co. v. Administrative Hearing Comm'n*, 646 S.W.2d 48, 49 (Mo. 1983); *L & R Egg Co. v. Director of Revenue*, 796 S.W.2d 624, 625 (Mo. banc 1990); and § 621.193, RSMo 1986 provides the applicable standard of review of a final decision of the AHC decided pursuant to § 621.050, RSMo 1986. We must affirm the decision of the AHC "if supported by the law and competent and substantial evidence on the whole record, and ... not clearly contrary to the reasonable expectations of the General Assembly." *L & R Egg Co.*, 796 S.W.2d at 625, quoting *G.T.E. Automatic Elec. v. Director of Revenue*, 780 S.W.2d 49, 50 (Mo. banc 1989). *See also* § 621.193, RSMo 1986.

This case concerns sales and use tax on machinery, equipment, and supplies purchased and used by the taxpayer at its principal place of business in Grandview, Missouri. The following are the five points of error raised by appellant in its petition for review. They constitute the disputed items which were taxed:

1) Machinery and equipment used to sort and package sample merchandise into boxes referred to as "demonstrator kits" and other merchandise orders;

2) Styrofoam "peanuts" used in packing the merchandise and the machinery and equipment used to produce those peanuts;

3) Polypropylene strapping material used to seal cartons for shipping and the machinery and equipment used to apply the strapping;

4) Machinery and equipment used to bale scrap cardboard for recycling; and

5) Conveyors used in its operation. Appellant claims these were fixtures and not taxable personal property.

A description of appellant's operation includes reference to some of the major items of equipment and machinery at issue in this lawsuit. All the merchandise appellant sells arrives at its facility in "containers," which are metal structures resembling semi-trailers. The merchandise is packed in large cardboard cartons and placed in the containers for shipping from the manufacturer's place of business. The containers are unloaded and the products are brought in on pallets owned by appellant. The pallets are taken by a forklift and placed into an inclined rack. These racks are referred to as "flow through racks." During the peak times the overflow of merchandise is stored in rented trailers.

The merchandise is eventually removed from the manufacturers' cardboard box and loaded by hand into the "side dispensers" or "side assembly conveyors" of a "Robo Pic," which is a unit over 600 feet in length. At the direction of a computer, the Robo Pic selects merchandise from 900 different side dispensers and drops the items into plastic bins that pass beneath it. A conveyor system moves the bins, which transport the merchandise to a packing area. At this point the merchandise undergoes final inspection and is readied for re-

packaging. The merchandise is then hand-packed into a cardboard box which is filled with the styrofoam peanuts and taped with the polypropelene strapping material.

The styrofoam peanuts are manufactured from pellets that appellant purchases from an outside source. A device called an "expander" is used to treat the pellets with steam. The pellets are treated, allowed to cure in large bags, and then retreated. This process is repeated several times to create the finished packing material.

The scrap cardboard that remains once the merchandise is removed from the manufacturer's cartons is transported by conveyor to a bailing machine where it is baled and eventually sold to Batliner Paper Stock Company for recycling.

The conveyor items that appellant uses in its operation were purchased and shipped to its plant. The appellant's purchase order stated that the transaction was to be governed by the Uniform Commercial Code. The conveyors were installed at the Grandview facility by the vendors according to specifications devised by appellant's engineering staff.

The business of appellant is selling merchandise such as Christmas decorations, toys and other gift items, which it markets through a "party plan." Appellant claims that it does not market the sale of individual items but rather markets a party plan operation where a "hostess" invites potential customers, usually friends and relatives, to "her" home for a party, and the customers are encouraged to place orders for the merchandise.

At the party, a "demonstrator" (an independent contractor who receives assistance and encouragement from the appellant's district managers) displays certain selected merchandise and, at the same time, distributes a catalog that offers many other items for sale. Appellant contends the selected merchandise displayed at the parties is part of a "demonstrator kit" it produces at its plant. The choice of items included in that selection is made by appellant. The kits are sold to demonstrators for $150.00. The demonstrator provides each hostess with a kit and, in turn, the hostess is responsible for taking orders, collecting money and sending both to the company.

## POINT I

An exemption from sales and use tax exists under § 144.030.2(5), RSMo 1986, when machinery or equipment is purchased "... to expand existing manufacturing, mining, or fabricating plants ... if such machinery and equipment is used directly in manufacturing, mining or fabricating a product which is intended to be sold ultimately for final use or consumption." Appellant contends that the equipment and machinery used to sort and package the merchandise it receives from other manufacturers, including that required to fill the boxes with the styrofoam peanuts and seal the boxes with the strapping material, should be exempt from taxation. Appellant claims this process constitutes "fabrication" of the demonstrator kit, which appellant argues is a "product" intended to be sold ultimately for final use or consumption within the meaning of § 144.030.2(5).

According to appellant, the demonstrator kit includes the cardboard box, the packing material (peanuts), the strapping used to seal the boxes and the merchandise to be sold. Appellant concedes that the demonstrator kit is not manufactured. Instead, it concentrates its argument on the definition of "fabricating" and claims that the term indicates a process distinct from "manufacturing", otherwise the legislature would not have included both terms in the statute. This entire argument, and appellant's exemption, hinges on whether the distinctions between "manufacturing" and "fabricating" proffered by appellant are consistent with the intent of the legislature and, if so, whether appellant's repackaging process fits within the intended scope of the statute.

Neither the taxing statute, Missouri regulations, nor Missouri case law has defined "fabricating" within the context of the statute. It should be defined in order to carry out the intention and purpose of the statute consistent with the expectations of the General Assembly. It is not logical to define the words "manufacturing" and "fa-

bricating" as synonymous within the context of § 144.030.2(5), since to do so would render one of them surplusage. *See Staley v. Director of Revenue,* 623 S.W.2d 246, 250 (Mo. banc 1981). However, while these terms have meanings and applications that may differ, they are often, in their broadest sense, interchangeable in meaning, and the definition in any particular instance must depend upon the environment of the particular use of either. *Union Wire Rope Corp. v. Atchison, T. & S.F. Ry. Co.,* 66 F.2d 965, 970 (8th Cir. 1933).

The common thread running throughout all of the cases in which this court has defined "manufacturing" is the production of an article with a new use different from its original use. *Unitog Rental Serv. v. Director of Revenue,* 779 S.W.2d 568, 570 (Mo. banc 1989). We have examined the term "fabrication" as it has been defined in several other jurisdictions.[1] Although some of these definitions appear applicable to appellant's position, it is difficult to distinguish between the terms "manufacturing" and "fabricating" in the environment of this case. Whether the process is "manufacturing" or "fabricating", each process requires the manipulation of an item in such a way as to create a new and distinct item, with a value and identity completely different from the original.

The AHC determined that "fabricating" meant "the assembly of a finished, merchantable product from pre-fabricated parts." A distinction between "manufacturing" and "fabricating" suggested by the AHC and adopted by the parties is that "fabricating" is the process of uniting pre-manufactured components into a single unit, while "manufacturing" concerns the process of creating a useful item from raw materials. Although this definition and distinction might seem plausible in the context of appellant's argument, it does not consider the other meanings of "fabricating" that are more consistent with the intent of the legislature. The correct interpretation of "fabricating" as used in § 144.030.2(5) is in a context as follows: "Fabricating" does not imply or signify "manufacturing" but the meaning of the term is restricted to cutting, carving, dressing, shaping and working over stone. *Commonwealth v. Paul W. Bounds Co.,* 316 Pa. 29, 173 A. 633, 634 (1934). "Fabricating" means the method of advancing an elementary or basic rolled iron or steel shape to a higher stage of development. *T.D. Downing Co. v. U.S.,* 282 F.Supp. 801, 807 (U.S.Cust.Ct.1968); *see also Noranda Aluminum, Inc. v. Department of Revenue,* 599 S.W.2d 1 (Mo.1980), where items purchased and used in a laboratory to test the quality of aluminum were deemed essential to and part of the manufacturing and fabrication of the aluminum into the final products (which did not consist of products that were united or assembled from other parts).[2] This Court's construc-

---

1. Examples of how "fabrication" has been defined that are relevant to appellant's argument include: [T]o frame, build, or forge; to form into a whole by uniting parts; to make, shape or prepare according to standardized specifications so as to be interchangeable; to construct or build up into a whole by uniting interchangeable or standardized parts often made elsewhere.... *Airlift Int'l, Inc. v. State Tax Comm'n,* 52 A.D.2d 688, 382 N.Y.S.2d 572, 574 (N.Y.1976) and *Foster & Creighton Co. v. Box,* 259 Ala. 474, 66 So.2d 746, 750 (Ala.1953), both citing Webster's Third New Int'l Dictionary; to construct by assembling the necessary parts and components.... *A.S. Schulman Electric Co. v. State Board of Equalization,* 49 Cal.App.3d 180, 122 Cal.Rptr. 278, 280 (Cal.App.1975); [a]ny process which involves the assembly of raw materials, components, sub-assemblies or parts into a functioning industrial unit.... *AT & T Information Sys., Inc. v. Comptroller of the Treasury Sales and Use Tax Div.,* 1990 W.L. 52029 (Md.Tax Ct.); to form by art or labor, to manufacture, produce.... *Volume Serv., Inc. v. C.F. Murphy & Assoc., Inc.,* 656 S.W.2d 785, 793 (Mo.App.1983). See also 35 C.J.S. *Fabricate,* p. 485 and *Words and Phrases,* Vol. 16 *"Fabricate"* (Supp.1991).

2. Similar definitions are found in *Union Wire Rope,* 66 F.2d at 969 to include: a convenient term to include reworking or assembling; cutting the various structural steel shapes to the required length, punching, drilling, planing the ends, and riveting the structural steel together; and bending, bolting, boring, burning, countersinking, cutting, drilling, flanging, gagging, painting, planing, punching, reaming, riveting, sawing, shearing, straightening, tapping, threading, and welding, ...

tion of statutory language becomes a part of the statute that must be read as incorporating the judicial interpretation placed on it. *Unitog*, 779 S.W.2d at 571. In its most logical application to the taxing statute the term "fabricating" refers to the process of transforming an item into a higher stage of development, not the uniting of several components into a single unit. It contemplates action to the item itself.

■■■ Appellant has focused its attention on "fabricating" in a context most favorable to its factual situation and has ignored other interpretations of that term. Generally, taxing statutes are to be strictly construed in favor of the taxpayer and against the taxing authority, but this rule does not extend to exemption provisions of the statute. *In Re First Nat. Safe Deposit Co.*, 351 Mo. 423, 173 S.W.2d 403, 405 (Mo. banc 1943). The exemption can be allowed only upon clear and unequivocal proof that it is required by the statute. *Id.* If there is any doubt of the exemption claimed, then it must operate most strongly against the party claiming the exemption. *Id. See also, Unitog*, 779 S.W.2d at 569.

■■ There are several applications of the term "fabricating" depending on the factual circumstance involved. The context appellant requests this Court to employ requires the inclusion of "manufacture." In appellant's environment, the terms have nearly identical meanings as both demand the creation of a new and distinct product having a distinct name, character and use. The simple result is that "manufacturing" and "fabricating" are functionally synonymous in this case and appellant has conceded that it does not manufacture the items it sells. The minute distinctions raised by appellant do not change the analysis. Any "manufacturing" or "fabricating" of the merchandise items that appellant sells was complete prior to those items being sorted and placed in the cardboard boxes for shipping. *See Sauder Woodworking Co. v. Limbach*, 38 Ohio St.3d 175, 527 N.E.2d 296, 297 (1988).

■■ Appellant claims that the demonstrator kit is a "product" with its own identity, having a utility and value wholly distinct from any of its component parts. If the demonstrator kit is not a product, as contemplated by the statute, then the fabrication issue is moot.

In the most basic terms, appellant's process is a garden variety repackaging and shipping of merchandise that arrives at the appellant's plant from outside sources. When the merchandise arrives, appellant removes the items from their cartons, and then inspects, repairs, sorts and repackages the merchandise for shipping. The items of merchandise are in their final state when appellant receives them. They retain their function and remain structurally independent.

To facilitate the shipping process, the appellant places the merchandise in cardboard boxes, fills the boxes with styrofoam peanuts, tapes the boxes shut and ships them to the demonstrator. There is no new and different product created that has a distinct name, character or use. The demonstrator kit is not the product being sold for final use and consumption. The product remains the individual items of merchandise packed into the box.

■■ The cardboard boxes and packing materials are not the product and are not being "fabricated" into a product. *See Safeway Sys., Inc. v. Norberg*, 115 R.I. 127, 341 A.2d 47, 50 (1975). There is no evidence that the boxes are used to display the merchandise at the parties or that the cardboard boxes have any other function in the selling process. The boxes, styrofoam peanuts and the strapping materials are nothing more than packaging and shipping materials and do not change the product to make it more suitable to the purchasers before it is used. The packing is not an inherent part of the product because the merchandise is equally functional and useable prior to its packaging. *See Sauder Woodworking*, 527 N.E.2d at 297.

Although "fabricating" has been broadly defined to encompass an array of situations, appellant's process of repackaging cannot be characterized as "fabricating" within the meaning of the statute. The appellant has not provided clear and un-

equivocal proof that it is entitled to the exemption. *See Safe Deposit*, 173 S.W.2d at 405. The granting or withholding of tax exemptions is uniquely and exclusively a legislative function. *Unitog*, 779 S.W.2d at 571. If repackaging and shipping merchandise is a process to be included in the definition of "fabricating" within the scope of § 144.030.2(5), it is for the legislature to pronounce such inclusion. *Id.*

We therefore hold that the demonstrator kit is not a fabricated product and the machinery and equipment used to place the merchandise in the cardboard boxes for shipping, including the machinery used to place the styrofoam peanuts in the cardboard boxes and to apply the strapping material, are not exempt from taxation. The appellant's first point is denied.

### POINT II

Appellant's second point alleges error in not exempting from the sales and use tax the machinery and equipment used to manufacture the styrofoam peanuts. Appellant claims it is entitled to the exemption either because the machinery and equipment forms an integral part of the overall process of "fabricating" the demonstrator kit, or because the machinery and equipment is used to "manufacture" a product (the peanuts) that is sold ultimately for final use or consumption. We address only the latter issue as the first contention is resolved in Point I.

The AHC found that the peanuts were manufactured by appellant and that finding is not an issue here. However, the AHC also found that the peanuts were not *sold* ultimately for final use or consumption pursuant to § 144.030.2(5). Therefore, the appellant must satisfy the "sold" portion of the statute in order to qualify for the exemption.

■ The appellant's vice president and controller testified that the peanuts were not sold to any outside customers but were used "entirely by the House of Lloyd" and solely to pack the merchandise in the boxes, otherwise appellant "would have a tremendous amount of breakage" during shipping. This evidence shows that the use

and consumption was enjoyed by appellant in order to protect its product, not by its customers. No other evidence is found indicating whether the cost of the peanuts was factored into the total price of the merchandise or whether a separate charge was made for them.

As previously stated, an exemption can be allowed only upon clear and unequivocal proof that it is required by the taxing statute. *Safe Deposit*, 173 S.W.2d at 405. If there is any doubt of the exemption claimed, then it must operate most strongly against the party claiming the exemption. *Id.* Appellant suggests that it has no burden to produce direct evidence that the peanuts were factored into the price of the product or were otherwise sold. This is not the case. The AHC was correct in concluding that appellant was required to introduce explicit evidence of a sale. The burden is on the taxpayer to clearly establish his right to the exemption. *Id.* Appellant did not meet that burden. The second point is denied.

### POINT III

Appellant next charges error in not exempting the purchase of the strapping material that seals the boxes because appellant claims it purchased the strapping and then "resold" it to its customers for final use and consumption.

■ Appellant claims it is entitled to exclusion under §§ 144.010.1(8), 144.605(7) and 144.605(10). The analysis here is similar to that found in Point II. Appellant does not sell the strapping material to anyone. There was no testimony that a separate charge is assessed for the strapping or that a charge is factored into the price of the merchandise. The strapping material simply facilitates the shipping process by holding the boxes together. It is used and consumed solely by the appellant to ensure safe delivery of the merchandise. It is not consumed or used by any of appellant's customers.

Appellant also suggests that the strapping material is an integral part of the demonstrator kit and that the kit is a fabri-

cated product. As we determined in Point I, the demonstrator kit is not the product being sold. Therefore, the strapping material is not sold as an integral part of the product. Appellant's third point is denied.

## POINT IV

For its fourth point appellant claims the AHC erred in not allowing exemption under § 144.030.2(5) for the machinery and equipment used in baling the scrap cardboard which is eventually sold to Batliner Paper Stock Company. Appellant employs a shotgun approach in claiming entitlement to the exemption. We discern the following arguments by appellant to support its point:

1. That the baling process constitutes the "manufacturing" of a product that is intended to be sold ultimately for final use or consumption;

2. That the baling process plays an integral part in "fabricating" the demonstrator kit and should be exempt; and

3. That even if the demonstrator kit is not a fabricated product, then the baling process constitutes "fabricating" a product when viewed as a discrete activity.

■ The process of gathering the scrap cardboard from the floor of appellant's plant, baling it and selling the bales to the Batliner Paper Stock Company is a recycling of the scrap cardboard. The term "manufacturing" found in § 144.030.2(5) does not include recycling. *See Unitog,* 779 S.W.2d at 571. This argument is without merit.

As we previously determined, the demonstrator kit is not a fabricated product within the meaning of the taxing statute. Therefore, appellant's second argument on this point is also without merit.

We have defined the term "fabricating" within the meaning of the statute. Appellant's recycling process does not meet the definition of "fabricating" when viewed as a discrete activity. Appellant is not transforming the cardboard into a higher stage

**3.** The Missouri statutes that contain the Uniform Commercial Code are found in Chapter

of development. It is simply cleaning up its facility and utilizing an economical method of discarding the refuse.

For the reasons given above, appellant's fourth point is denied.

## POINT V

Appellant purchased machinery and equipment that it describes as conveyor items that are used as part of its system. Appellant contends that title passed from the vendor after the conveyors were installed in its plant. The determinative question is at what point title to the conveyor items passed to the appellant. If title passed after the conveyor items were installed in the plant they became fixtures and, therefore., were part of the realty and were excluded from the sales/use tax. If title passed at any time before installation, the conveyor items are subject to taxation. The taxable point is when appellant became the titleholder of the conveyor items, and the issue is whether it held title to the goods as a fixture or tangible personal property. *See Marsh v. Spradling,* 537 S.W.2d 402 (Mo.1976).

■ Appellant's purchase order was entered into evidence by stipulation. It specifies, "This order shall be governed by the Uniform Commercial Code ... as adopted in the state of Missouri...." Condition # 13 also required that "[t]his writing is intended by the parties as a *final expression* of their agreement and is *intended* also as a *complete* and *exclusive* statement of the terms of their agreement ... and no usage of the trade shall be relevant to supplement or explain any term used in this agreement...." (Emphasis added). Both parties agree that the purchase order provides the answer as to when title passed. The parties acknowledge that the pivotal issue is whether subparagraph (a) or (b) of § 400.2–401(2) applies.[3]

Respondent claims title passed upon shipment at the vendor's plant, relying on two entries on the front of the purchase order.

400, RSMo 1986.

The first has "F.O.B." preprinted followed by a typewritten entry, "Truman, Arkansas". A second entry is located under the preprinted instructions to the vendor, "Ship F.O.B. your plant."

Appellant's position is based on the preprinted language of Condition #6 on the back of the purchase order, which states: "Risk of loss of the goods shall pass to Buyer at the time that the goods are actually tendered for delivery to Buyer at his offices in Grandview, Missouri." Appellant necessarily urges that title did not pass until after installation arguing that this result is compelled by the parties' agreement embodied in Condition #6 of the purchase order and the testimony of appellant's witness. It is appellant's position that the provision in Condition #6 shifting the risk of loss identifies the delivery point at destination, i.e., Grandview, Missouri, which operates to transfer title there and that the importance of the point of delivery under the UCC is to locate where the "risk of loss" is to pass under § 400.2–509.

While delivery is relevant to § 400.2–509, the importance of delivery is not limited to that section. Delivery is relevant in a number of situations, including passage of title under § 400.2–401. Sections 400.2–401 and 400.2–509 concern the different and distinct concepts of title and risk of loss respectfully.

■ The transfer of title and the responsibility for loss do not necessarily occur at the same time. Section 400.2–509 specifies that the risk of loss is determined on the basis of contractual rights and obligations as opposed to the "title" concept heretofore used by the Missouri courts. *See* Missouri Code Comment. The parties have the right to agree that the risk of loss will not shift at the same time title passes. *See* generally *Jason's Foods, Inc. v. Peter Eckrich & Sons, Inc.*, 774 F.2d 214 (7th Cir.1985). This issue was addressed in *Taylor & Martin, Inc. v. Hiland Dairy, Inc.*, 676 S.W.2d 859, 867–68 (Mo.App. 1984), which quoted extensively from *Hughes v. Al Green, Inc.*, 65 Ohio St.2d 110, 418 N.E.2d 1355, 1357 (1981), where the court stated: "It is true that the person

with title will also (and incidentally) often bear the risk that the goods may be destroyed or lost; *but the seller may have title and the buyer the risk,* or the seller may have the risk and the buyer the title." (Citation omitted). Condition # 6 unmistakenly designates Grandview, Missouri, as the point where the risk of loss shifts from one to the other pursuant to § 400.2–509. It is not an agreement intended to transfer title. The risk of loss is not an issue in this case.

Nevertheless, assuming we accept appellant's argument that title passed at Grandview, Missouri, the conveyors would still be left unattached and taxable. The testimony was that the vendor provided the labor to place the conveyors in the plant and the appellant supervised the operation according to the plans and specifications of its engineering staff. Appellant's witness testified that it "took possession" after installation. The AHC found the testimony neither persuasive that title passed after installation nor adverse to its finding that title passed at Truman, Arkansas. The Commission's finding was supported by the competent and substantial evidence. *See GTE Automatic Elec.*, 780 S.W.2d at 50.

Admittedly the vendor performed the labor installing the conveyors after the parts arrived at appellant's plant. Because the vendor was required to perform labor under the purchase order after delivery does not necessarily determine the time or place that title to the goods passed. In *Kurtz Concrete, Inc. v. Spradling*, 560 S.W.2d 858 (Mo. banc 1978), title to the concrete passed when it was mixed at the vendor's plant even though the vendor had the additional obligation to deliver the concrete and pour it.

Additionally, Condition # 13 on the back of the purchase order expressly prohibits any extraneous evidence from altering the terms of the agreement and would void the witness's testimony to the extent the testimony varied the terms of the purchase order. Neither the purchase order nor the testimony provide evidence of an intention to pass title at the Grandview plant or after installation.

*Comment* (1) to UCC 2–401 indicates that when the issue of title is material, this section details guidelines concerning the point and place that title passes. *See also Franklin Fibre–Lamitex Corp. v. Director of Revenue*, 505 A.2d 1296, 1299 (Del.1985). Title is material to the resolution of this point, and when it passed is the determinative issue. The relevant portion of § 400.2–401 is:

> Insofar as situations are not covered by the other provisions of this article and matters concerning title become material the following rules apply:
>
> (2) Unless otherwise explicitly agreed *title* passes to the buyer at the time and place at which the seller completes his performance with reference to the *physical delivery* of the goods.... (emphasis added)
>
> (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; ...

■ The parties have the right to control the time and place that passage of title occurs by their express intent. *See Kurtz Concrete, Inc.*, 560 S.W.2d at 862. However, these intentions control only when the parties "otherwise explicitly agreed" when title will pass. *Sprague v. Johnson*, 195 Ill.App.3d 798, 142 Ill.Dec. 86, 552 N.E.2d 436, 438 (1990). "Explicitly agreed" means that which is so clearly stated or distinctly set forth that there is no doubt as to its meaning. *See Harney v. Spellman*, 113 Ill.App.2d 463, 251 N.E.2d 265, 266 (1969). The parties admit that there was no explicit agreement when title was to pass. Absent an explicit agreement, " ... title passes ... at the time and place at which the seller completes his performance with reference to the physical delivery of the goods...." Section 400.2–401(2). Section 400.2–401 equates delivery of possession to transfer of title. *See, e.g. Motors Ins. Corp. v.*

*Safeco Ins. Co. of Am.*, 412 S.W.2d 584, 585 (Ky.1967).

■ The general rule is that, absent an intention of the parties, under a contract F.O.B. the point of shipment, the title passes at the moment of delivery to the carrier. *See* 77 C.J.S. *Sales* § 259(b) pp. 1053–54 (and citations thereunder). Missouri follows the general rule. In *Tuttle v. Bracey–Howard Constr. Co.*, 136 Mo.App. 309, 117 S.W. 86 (1909), the court held that the sale was complete on delivery of the material F.O.B. Trenton. Title passed upon the shipment of the goods. Delivery to the carrier vested title in the buyer. *Id.* at 88.

Respondent suggests that the F.O.B. entries on the front of the purchase order express the parties' intent to transfer title at the point of shipment, Truman, Arkansas. Section 400.2–319, RSMo defines "F.O.B." (free on board) in the context of the purchase order used by the parties as a "delivery term." *See* Missouri Code Comment (1). Delivering the goods to the point of shipment and putting them in the carrier's possession constituted "delivery" [4] under the UCC. Section 400.2–319(1)(a).

■ The typewritten language on the face of the purchase order indicates an intent that the vendor's responsibility with respect to delivery is to place the goods in the hands of a carrier at its plant in Truman, Arkansas. All of the entries on the purchase order are preprinted except the first one mentioned, where Truman, Arkansas, is typewritten. This typewritten entry controls over the preprinted language in Condition # 6. When there is a conflict between the typewritten and preprinted language in a contract, the typewritten will prevail as the true intent of the parties. *Century 21–Andrews Realty, Inc. v. Adams*, 691 S.W.2d 511, 512 (Mo.App. 1985).

In this case the conveyors were required to be shipped from the vendor's plant in Truman, Arkansas, to Grandview, Missouri. The purchase order that directed

---

**4.** We note that F.O.B. may also be used in the context of the contract price but that is not its use here. See also, the cases cited under Comment, § 400.2–319, to the effect that F.O.B. is a term of delivery and not necessarily price.

the vendor to "F.O.B. Truman, Arkansas" has a clear and unambiguous meaning, requiring the seller to deliver the goods to the carrier at the point of shipment. When the conveyors were delivered to the carrier for shipment, the vendor's obligation with respect to "physical delivery" was complete in accordance with the meaning of the plain terms of the purchase order. *See Tuttle,* 117 S.W. at 88. Title to the goods passed at the point of shipment consistent with § 400.2–401(2)(a) and not later at destination per § 400.2–401(2)(b). Neither the purchase order nor the testimony provide evidence of a contrary intention.

We hold that the printed and typed entries showing F.O.B. at Truman, Arkansas, rules the issue of the place of the transfer of title and not Condition # 6, which dealt with the shift of the risk of loss. The point is ruled against the appellant.

The decision of the Administrative Hearing Commission is affirmed.

ROBERTSON, C.J., RENDLEN, COVINGTON, HOLSTEIN and BLACKMAR, JJ., and SHRUM, Special Judge, concur.

BENTON, J., not sitting.

THOMAS, J., not sitting because not a member of the Court when case was submitted.