UTILICORP UNITED, INC., d/b/a Missouri Public Service Company, Sho-Me Power Electric Cooperative, Inc., and NW Electric Power Cooperative, Inc., Appellants,

v.

DIRECTOR OF REVENUE, Respondent.

No. SC 83599.

Supreme Court of Missouri, En Banc.

Dec. 18, 2001.

Rehearing Denied Jan. 22, 2002.

Edward F. Downey, Jefferson City, Juan D. Keller, John P. Barrie, B. Derek Rose, St. Louis, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Todd Iveson, Sp. Asst. Atty. Gen., James R. Layton, State Sol., Jefferson City, for Respondent.

MICHAEL A. WOLFF, Judge.

Missouri's sales and use tax law offers an exemption from sales or use tax for purchases of equipment directly used in manufacturing. The parties agree that the production of electricity is within the definition of manufacturing under Missouri's sales and use tax law. The question presented here is whether transformers, voltage regulators, and other equipment used between the electric generators and the place where the electricity is delivered to the customer are used directly in manufacturing within the meaning of section 144.030.2(4) and (5).[1]

The utilities seeking the sales tax exemption bear the burden of proving their entitlement to the exemption. While a plausible, if somewhat strained, argument might be made that the manufacturing process for electricity continues up to the point of delivery to the customer, the

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

argument for treating the equipment as part of the transmission process is more compelling. The question is whether the utilities have shown entitlement to the exemption; this Court holds that they have failed to carry their burden.

The administrative hearing commission held that the utilities do not qualify for the exemption. This Court has jurisdiction of the appeal. *Mo. Const. art. V, section 3.* The Commission's decision is affirmed.

**Facts**

The facts are stipulated. Utilicorp United, Inc., NW Electric Power Cooperative, Inc., and Sho–Me Electric Cooperative, Inc., are Missouri electric utilities that sell electricity to their customers.[2] Utilicorp, a for-profit corporation, and Sho–Me, an electric cooperative formed under chapter 394, have generating facilities where they produce electricity. They also buy electricity from other utilities, which they sell to their customers. NW Electric Power Cooperative, also a chapter 394 cooperative, does not have generating facilities and buys all of its electricity from Associated Electric Cooperative, Inc. Though Sho–Me has a hydroelectric plant, it buys most of its electricity from Associated Electric Cooperative.

During the tax period in question, Utilicorp had approximately 246,000 customers in western Missouri in four different groups: commercial, residential, retail and wholesale. Sho–Me had 27 customers in south-central Missouri and elsewhere, and its customers were electric cooperatives, municipalities and one industrial customer.

NW had seven electric-cooperative customers in northwest Missouri and elsewhere.

All three utilities have substations and other equipment sites throughout their service areas for delivering electricity to their customers. Electric utilities recognize three stages in providing electricity to customers production, transmission, and distribution.

Production refers to the generation of electricity by converting the potential of coal, nuclear fuel, or dammed water into electricity. Production also refers to the purchase of electricity, generated by someone else, for resale to a utility's own customers.

Transmission involves the transfer of electricity from generating sources to local distribution systems. Transformers, regulators, and other equipment are used to change the voltage, amperage, or power factor of electricity to facilitate its transmission across various distances within the utility's system.

Distribution involves transfer of electricity to the customers. Distribution also utilizes various devices and equipment, some of which change the voltage, amperage, or power factor of electricity to meet the customers' demands or regulatory standards.

The equipment purchases for which the utilities claim a tax exemption include:

(1) Step-down transformers: transformers used to reduce the voltage and increase amperage, predominately at substations or on poles or transformer pads near the customers' meters. These pur-

---

**2.** Utilities generate electricity for sale to consumers. In everyday usage, one may speak of "electricity," "electric power," and "electric energy" interchangeably. Technically, "power" and "energy" are distinct concepts. Power is measured in kilowatts; energy is measured in kilowatt-hours.

Consumers ultimately pay for electric energy. The amount of energy used is the power used times usage duration. This formula is: Energy used (kilowatt-hours) = Power used (kilowatts) × Usage duration (hours).

This opinion uses "electricity" to describe the product generally, reserving the terms "power" and "energy" for technical usage.

chases constitute most of the tax money claimed. Utilicorp's claim is for $35,188.09; Sho–Me's claim is for $77,131.00; and NW's claim is for $42,710.08.

(2) A current transformer: a small transformer connected to the power system and in this case located in a power substation to take measurements of currents and voltages. Utilicorp claimed a $32.70 refund for the use tax paid on one current transformer.

(3) Capacitors: instruments located in the vicinity of the customers and useful for controlling voltage to meet regulatory standards for delivery of power to the customers. Sho–Me claimed a refund of $243.36 and NW claimed a refund of $440.26 in use taxes on purchases of capacitors.

(4) Supervisory control and data acquisition hardware: equipment used to provide information back from the distribution system to the control equipment for the generator in order to adjust the generators' outputs to the needs of the customers. Sho–Me claimed $3,078.66 and NW claimed refunds of $13,117.15 of use tax on such hardware.

## Discussion

None of the equipment on which use tax refunds are claimed is used in generating electricity. The parties agree that generating electricity is manufacturing within the meaning of the statute, section 144.030.2(4) [3] and (5).[4]

The question is whether the transmission and distribution of electricity are also "manufacturing." Because this case involves an exemption from sales and use tax, it is the taxpayers' burden to show that they qualify for the exemption. Sections 136.300.1 and 2 and 621.050.2, RSMo 2000.[5] See, e.g., Westwood Country Club

3. Section 144.030.2(4) states in part: "Replacement machinery, equipment, and parts and the materials and supplies solely required for the installation or construction of such replacement machinery, equipment, and parts, used directly in manufacturing, mining, fabricating or producing a product which is intended to be sold ultimately for final use or consumption; and machinery and equipment, and the materials and supplies required solely for the operation, installation or construction of such machinery and equipment, purchased and used to establish new, or to replace or expand existing, material recovery processing plants in this state." Effective August 28, 1996, the legislature eliminated the requirement that the machinery and equipment be replaced by reason of design or product changes, and merely required that the replacement machinery and equipment replace and be used for the same purposes or to produce a substantially similar product as the machinery equipment.

4. Section 144.030.2(5) states in full: "Machinery and equipment, and parts and the materials and supplies solely required for the installation or construction of such machinery and equipment, purchased and used to estab-

lish new or to expand existing manufacturing, mining or fabricating plants in the state if such machinery and equipment is used directly in manufacturing, mining or fabricating a product which is intended to be sold ultimately for final use or consumption."

5. Section 136.300.1 states in part: "With respect to any issue relevant to ascertaining the tax liability of a taxpayer all laws of the state imposing a tax shall be strictly construed against the taxing authority in favor of the taxpayer. The director of revenue shall have the burden of proof with respect to any factual issue relevant to ascertaining the liability of a taxpayer...." However, section 136.300.2 states in full: "This section shall not apply to any issue with respect to the applicability of any tax exemption or credit." Section 621.050.2 states in part: "In any proceeding before the administrative hearing commission under this section the burden of proof shall be on the taxpayer...."

Thus this Court has concluded that, while it is the director's burden to show a tax liability, it is the taxpayer's burden to establish the right to an exemption. See, e.g., Westwood Country Club, 6 S.W.3d at 887.

*v. Director of Revenue,* 6 S.W.3d 885, 887 (Mo. banc 1999).

This Court's decision in *Galamet, Inc. v. Director of Revenue,* 915 S.W.2d 331, 333 (Mo. banc 1996), traces the various factual settings of manufacturing, which includes the changing of an item or product so as to make it suitable for a new use. Production of intangibles, such as computer data, may be included as manufacturing. *International Business Machines Corp. v. Director of Revenue,* 958 S.W.2d 554, 557 (Mo. banc 1997).

Once coal, nuclear fuel or dammed water has been converted into electricity by the generating process, it is rational to conclude that a "product" has been "manufactured." But since electricity is invisible, if not exactly intangible,[6] discussions of electricity tend to involve the use of analogies and figures of speech. We speak of "currents" and "flows" in the same way we describe water.[7]

The utilities invite us to think of the production and distribution of their product the way we think of cement, a product whose manufacturing is completed in cement mixers as it is being delivered.[8]

On the other hand, the director of revenue invites us to think of the product as analogous to the process in *House of Lloyd*

*v. Director of Revenue,* 824 S.W.2d 914 (Mo. banc 1992), which involved the repackaging and shipping of items already manufactured.

These analogies to the world of visible objects are helpful in supplying the mental imagery needed to discern how far the concept of manufacturing can be stretched to fit the various stages of electric production, transmission, and distribution. Employing these analogies, the cement mixer example falls short because the raw materials, including water, sand, and gravel, are put in the mixer, which makes a new product while it is being delivered. The essential question is: Does the transforming and regulating of electricity by these devices result in a "new" product or simply the "repackaging" of an existing product? The repackaging example seems closer to the point.

The product—electricity—may have its voltage increased, and thereby its amperage reduced, for transmission across distances.[9] And its voltage may be reduced and its amperage thereby increased near the customer's meter to deliver electricity at a voltage suitable for the customer's needs. But the essential product, and the total electric power expressed in watts, remains fundamentally unchanged from

6. The word "intangible" from its Latin roots means something that cannot be touched or perceived by touch. WEBSTER'S THIRD NEW INT'L DICTIONARY (3d ed.1993). Electricity can be touched, and when a person does so and thereby completes an electrical circuit, it may be the last earthly sensation he or she feels.

7. The parties' stipulation of facts, recited in the administrative hearing commission's decision, uses the water analogy: Current or amperage is analogous to the flow of water in a pipe. When the tap is closed, or the electric switch is off, there is no current. Voltage is analogous to water pressure in a pipe. The pressure is the same whether the tap, or the electric switch, is on or off.

8. There are two Missouri tax cases involving concrete but neither deals with manufacturing. *See Kurtz Concrete, Inc. v. Spradling,* 560 S.W.2d 858 (Mo.1978), and *Southern Red–E– Mix Co. v. Director of Revenue,* 894 S.W.2d 164 (Mo. banc 1995).

9. Electricity has an "electric force" measured in volts and a "current" measured in amperes or amps. "Power" is measured in watts, kilowatts, or megawatts. One watt is equal to one amp times one volt. This formula is: Power (watts) = Electric force (volts) × Current (amperes).

the time and place the electricity was generated.

It is, thus, rational as well to conclude that the equipment whose purchase is at issue here is used in the transmission and distribution of the product and is not, in the words of section 144.030.2(4) and (5), "used directly" in manufacturing.

To carry their burden of showing that they qualify for the exemption, the utilities contend that the equipment in each case is part of an "integrated plant." *See Concord Publishing House, Inc. v. Director of Revenue*, 916 S.W.2d 186, 191 (Mo. banc 1996), and *DST Systems, Inc. v. Director of Revenue*, 43 S.W.3d 799, 803 (Mo. banc 2001). *DST Systems* is pertinent, the utilities contend, because the Court held that DST's computer system was part of an integrated plant that produced printed statements through a different, but related, corporation and at a site apart from the DST computers. The equipment at issue here is not at the generator sites, but rather is dispersed throughout the utilities' service areas.

*DST Systems* is of no help to the utilities. Much of the electricity transmitted and distributed by them is not generated by them. In particular, NW has no generating facilities and, thus, clearly cannot show that its facilities are part of anyone's integrated plant.

More fundamentally, none of the utilities can show that, through the use of this equipment, the utility makes something new and different, whether it generates the electricity or buys the electricity from others. Though volts and amperes may change during the transmission and distribution, not every change is "manufacturing." *L & R Egg Co. v. Director of Revenue*, 796 S.W.2d 624 (Mo. banc 1990). *See also House of Lloyd v. Director of Revenue*, 824 S.W.2d at 914. The total amount of electric energy does not change very much from the point of generation to the points of use. Electric energy is sold by its producers and distributors in quantities of power over a time period, commonly expressed as "kilowatt—hours" or "megawatt—hours." A kilowatt of power can be 100 volts at 10 amperes, or it can be 1,000 volts at one ampere. The product is the same; only its measurements change. By either measure it is the same product, and nearly the same total amount of product.[10]

The essential character of electricity—the aggregation of subatomic particles that utilities can generate, transmit, distribute, measure and sell—is not changed by the equipment at issue here. Nothing is added and nothing is subtracted in the transmission and distribution process.[11]

Most items of the equipment at issue here are step-down transformers used to reduce the voltage to a level that customers, including residential customers who

---

10. Transmission is not perfectly efficient, so there is some marginal "loss" in the transmission of electric energy, but the goal of these utilities is to keep as constant as possible the total energy from generator to users.

11. The dissent says that Missouri, Georgia and New York are in the minority on this issue. *But see, City of Ames v. State Tax Comm'n*, 246 Iowa 1016, 71 N.W.2d 15, 28–29 (Iowa 1955) (taxpayer's substations and transformer dealt "only with controlling and transforming the voltage of the electricity after it is manufactured ... this equipment is neither used in manufacturing nor servicing electricity."). While some jurisdictions reach the opposite result this Court reaches today, they are of course governed by their own statutory language. Some have relied on their own particular statutory schemes to conclude that the generation of electricity is not even manufacturing for purposes of a tax exemption. *See United Illuminating Co. v. Groppo*, 220 Conn. 749, 601 A.2d 1005, 1008 (1992), and *State v. New Orleans Ry. & Light Co.*, 116 La. 144, 40 So. 597, 598–99 (1906).

need only 120–240 volt service, demand. It might be noted that consumers have transformers of their own in their homes that perform the same function for various appliances—these are the small transformers found at the plugs of various electrical devices that reduce the voltage to the six or nine or whatever small voltage the device uses. While a consumer's small appliance transformers are performing the same function as the step-down transformers used by the utility company outside the home, it would be difficult to contend that a consumer using such transformers is "manufacturing" electricity.

### Conclusion

This Court concludes that the utilities have not carried their burden of showing that the equipment at issue here, which clearly is used in the transmission and distribution of their product, was used directly in manufacturing and thereby entitled to be exempt from sales or use taxes. Accordingly, the Commission's decision is affirmed.

WHITE, HOLSTEIN, BENTON and LAURA DENVIR STITH, JJ., concur.

PRICE, J., dissents in separate opinion filed; LIMBAUGH, C.J., concurs in opinion of PRICE, J.

WILLIAM RAY PRICE, JR., Judge, dissenting.

I dissent from the majority opinion. The basis of my dissent is simple. Missouri law provides an exemption from sales and use tax for equipment "used directly in manufacturing ... or producing a product". Section 144.030.2, RSMo. I do not believe that the transmission and distribution of electricity can be artificially distinguished from the generation of the electricity for purposes of defining the manufacturing or production of the "prod-uct" subject to the sales and use tax exemption.

The distinction made by the majority is not one expressly stated in the statute. The sales and use tax law makes no specific reference to any generation, transmission, or distribution distinctions. Section 144.030.2 speaks only to the "manufacturing" or "producing" of a "product".

The majority mistakenly designates the "product", electricity, as if it were sold raw at the generating plant. Instead, the "product" is the electricity that is sold at the point of use, after it has been transmitted and transformed to a voltage consistent with its use. All of the equipment at issue is necessary to provide the electricity where it is needed and in a voltage that can be used. Electricity simply is not a product that is commonly sold to consumers, either industrial or residential, on a "cash and carry" basis.

Even though some of the utility taxpayers buy electricity generated by others and merely transmit and distribute it to Missouri customers, the integrated plant doctrine is applicable. *DST Systems, Inc. v. Director of Revenue*, 43 S.W.3d 799 (Mo. banc 2001), is precisely on point.

As stated above, the "product" is not a theoretical analogy or image. The electricity that a consumer buys is delivered to the consumer in usable form. The activities of transforming, transmitting, and distributing the electricity from the plant to the ultimate customer is just as necessary to the "manufacturing" and "producing" of the product as is the generation of the electricity itself. The majority of other jurisdictions that have considered this issue have ruled accordingly. *City of Louisville v. Howard*, 306 Ky. 687, 208 S.W.2d 522 (1947); *Northern States Power Company v. Comm. of Rev.*, 571 N.W.2d 573 (Minn.1997); *Maine Yankee Atomic Power v. State Tax Assessor*, 690 A.2d 497 (Me.

1997); *Curry v. Alabama Power Company*, 243 Ala. 53, 8 So.2d 521 (1942). Only New York, *Niagara Mohawk Power Corp. v. Wanamaker*, 286 A.D. 446, 144 N.Y.S.2d 458 (N.Y.App.Div.1955), *aff'd*, 2 N.Y.2d 764, 157 N.Y.S.2d 972, 139 N.E.2d 150 (1956), and Georgia, *Forrester v. North Georgia Elec. Membership Corp.*, 66 Ga. App. 779, 19 S.E.2d 158, 163–64 (1942), stand apart.[1]

---

1. The majority cites *City of Ames v. State Tax Comm'n*, 246 Iowa 1016, 71 N.W.2d 15, 28–29 (Iowa 1955). However, the Supreme Court of Iowa implicitly overruled *City of Ames* in *Linwood Stone Products Co. v. State Dep't of Revenue*, 175 N.W.2d 393 (1970), holding transformers to be equipment directly used in processing tangible property and thus exempting the equipment from a use tax. Also, the majority makes much ado about jurisdictions that, based on their statutory schemes, do not consider electrical generation to be production or manufacturing. *United Illuminating Co. v. Groppo*, 220 Conn. 749, 601 A.2d 1005, 1008 (1992). These cases simply are not applicable in Missouri where all agree that electrical generation is manufacturing; the only question here is where manufacturing ends.